(Nos. 67147, 67152, 67181 cons.—

THE CITY OF FREEPORT, Appellee, v. THE ILLINOIS STATE LABOR RELATIONS BOARD *et al.*, Appellants.—THE VILLAGE OF WHEELING, Appellant, v. THE ILLINOIS STATE LABOR RELATIONS BOARD, Appellee.

*Opinion filed April 18, 1990.*

500

502

MILLER, J., concurring in part and dissenting in part.

Neil F. Hartigan, Attorney General, of Springfield (Robert J. Ruiz, Solicitor General, and Valerie J. Peiler, Assistant Attorney General, of Chicago, of counsel), for appellants Illinois State Labor Relations Board *et al.*

J. Dale Berry and Gilbert Feldman, of Cornfield & Feldman, of Chicago, for appellant AFSCME Council 31.

John T. Weise, of Seyfarth, Shaw, Fairweather & Geraldson, of Chicago, for appellee City of Freeport.

Thomas W. Kelty, of Pfeifer & Kelty, P.C., and Roger Huebner, both of Springfield, for *amicus curiae* Illinois Municipal League.

James A. Murphy, of Peoria, and Giacomo A. Pecoraro, of Springfield, for *amicus curiae* Illinois Association of Chiefs of Police, Inc.

James C. Franczek, Jr., Andrea R. Waintroob and James J. Zuehl, of Vedder, Price, Kaufman & Kammholz, of Chicago, for *amicus curiae* Illinois Public Employer Labor Relations Association.

No. 67131.—Appeal from the Appellate Court for the First District; heard in that court on a petition for review of an order of the Illinois State Labor Relations Board.

James Baird and Gary S. Kaplan, of Seyfarth, Shaw, Fairweather & Geraldson, of Chicago, for appellant Vil-

lage of Wheeling.

Neil F. Hartigan, Attorney General, of Springfield (Robert J. Ruiz, Solicitor General, and Ann Plunkett-Sheldon, Assistant Attorney General, of Chicago, of counsel), for appellee Illinois State Labor Relations Board.

J. Dale Berry, of Cornfield & Feldman, of Chicago, for appellee Wheeling Firefighters Association.

James C. Franczek, Jr., Andrea R. Waintroob and James J. Zuehl, of Vedder, Price, Kaufman & Kammholz, of Chicago, for amicus ‘curiae Illinois Public Employer Labor Relations Association.

Wayne M. Klocke, of Long, Rabin & Young, Ltd., of Springfield, for amicus curiae Associated Fire Fighters of Illinois.

Joel A. D'Alba and Anne Wells Clark, of Chicago (Asher, Pavalon, Gittler & Greenfield, Ltd., of counsel), for amicus curiae Illinois State Federation of Labor, AFL-CIO.

JUSTICE WARD delivered the opinion of the court:

These consolidated actions are before this court on administrative review of certain orders of the Illinois State Labor Relations Board (Board). We must consider whether the Board erred in determining that certain employees of the Village of Wheeling fire department and of the City of Freeport police department were not supervisors within the meaning of section 3(r) of the Illinois Public Labor Relations Act (Act) (Ill. Rev. Stat. 1987, ch. 48, par. 1603(r)).

In Nos. 67147 and 67152, the American Federation of State, County and Municipal Employees (AFSCME) petitioned the Board for certification as the exclusive bar-

gaining representative of certain employees, including lieutenants and sergeants, of the Freeport police department. The City opposed the petition arguing that the lieutenants and sergeants in the department were "supervisors" within the meaning of the Act and should be excluded from the bargaining unit. The matter was referred to a hearing officer, who determined that neither the sergeants nor the lieutenants satisfied the statutory definition of "supervisor." Accordingly, the hearing officer recommended that AFSCME be certified as the representative of an employee bargaining unit composed of all sworn officers of the department except the chief and assistant chief of police. The Board accepted the recommended decision and directed an election within the bargaining unit. (*City of Freeport*, 2 Pub. Employee Rep. (Ill.) par. 2052 (ISLRB 1986).) Following the representation election, the Board certified AFSCME as the exclusive bargaining representative of the unit. When Freeport refused to bargain, the Board determined that it had engaged in an unfair labor practice. Freeport appealed, challenging the inclusion of lieutenants and sergeants in the bargaining unit. The appellate court held that the Board's decision was contrary to the manifest weight of the evidence and reversed the order finding Freeport guilty of an unfair labor practice. (169 Ill. App. 3d 151.) We allowed the Board's and AFSCME's petitions for leave to appeal (107 Ill. 2d R. 315(a)).

In No. 67181, the Wheeling Firefighters Association, a labor union (the Union), petitioned the Board for certification as the exclusive representative of a bargaining unit composed of all full-time fire department employees. The matter was referred by the Board to a hearing officer. At the hearing, the Village of Wheeling argued that those individuals holding the rank of lieutenant were supervisors and should be excluded from the bargaining unit. The hearing officer rejected this argument and

recommended that the union be certified as the representative of an employee bargaining unit composed of all full-time fire department employees except the chief, the assistant chief and the fire inspector. The Board accepted the recommended decision of the hearing officer and directed an election within the bargaining unit. (*Village of Wheeling*, 3 Pub. Employee Rep. (Ill.) par. 2005 (ISLRB 1986).) Following the representation election, the Board certified the Union as the exclusive bargaining representative of the unit. When the Village refused to bargain with the Union in order to obtain appellate review of the unit determination, the Board found that it had engaged in an unfair labor practice. The Village appealed and the appellate court affirmed the order of the Board. (170 Ill. App. 3d 934.) We allowed the Village's petition for leave to appeal (107 Ill. 2d R. 315(a)).

The Illinois Public Labor Relations Act (Ill. Rev. Stat. 1987, ch. 48, par. 1601 *et seq.*) provides a comprehensive system of collective bargaining for those public employees and employers who fall within its scope. (*County of Kane v. Carlson* (1987), 116 Ill. 2d 186, 196.) The Act specifies, however, that a bargaining unit determined by the Board may not include both supervisors and nonsupervisors. See Ill. Rev. Stat. 1987, ch. 48, pars. 1603(n), (s)(1).

Section 3(r) of the Act defines a "supervisor" as follows:

" 'Supervisor' is an employee whose principal work is substantially different from that of his subordinates and who has authority, in the interest of the employer, to hire, transfer, suspend, lay off, recall, promote, discharge, direct, reward, or discipline employees, or to adjust their grievances, or to effectively recommend such action, if the exercise of such authority is not of a merely routine or clerical nature, but requires the consistent use of independent judgment. Except with respect to police employment, the term 'supervisor' includes only those in-

dividuals who devote a preponderance of their employment time to exercising such authority State supervisors notwithstanding." Ill. Rev. Stat. 1987, ch. 48, par. 1603(r).

This definition is similar to that in the National Labor Relations Act (NLRA) (29 U.S.C. §151 *et seq.* (1982)), which also excludes supervisors from collective-bargaining units. The exclusion of supervisors in the NLRA was thought necessary to redress a perceived imbalance in labor-management relationships that arose when supervisors were put in the position of serving two masters with opposing interests. (*Beasley v. Food Fair of North Carolina, Inc.* (1974), 416 U.S. 653, 660, 40 L. Ed. 2d 443, 449-50, 94 S. Ct. 2023, 2027.) The exclusion of supervisory employees from bargaining units ensures employers that pro-union bias will not impair the supervisor's ability to apply the employer's policies to subordinates according to the employer's best interests.

This same philosophy is reflected in our act. The definition of "supervisor" in our statute, however, is narrower than that in the NLRA. Under the NLRA, an individual who has authority to perform supervisory functions with independent judgment is considered a supervisor and excluded from bargaining units. (29 U.S.C. §152(11) (1982).) Our act, however, adds two requirements which are not included in the NLRA's definition. First, the individual's principal work must be substantially different from that of his subordinates. Second, except with respect to police employment, only those individuals who spend the preponderance of their employment time exercising the enumerated supervisory functions may be considered supervisors. Accordingly, while National Labor Relations Board precedent is useful in determining whether an individual performs any of the enumerated functions with independent judgment, it is not useful in analyzing the "principal work" and "pre-

ponderance" prongs of our supervisory definition. See *City of Burbank v. Illinois State Labor Relations Board* (1989), 128 Ill. 2d 335; *City of Peru v. Illinois State Labor Relations Board* (1988), 167 Ill. App. 3d 284; *City of Burbank*, 1 Pub. Employee Rep. (Ill.) par. 2008 (ISLRB 1985).

The Illinois State Labor Relations Board, the agency charged with responsibility for administering and enforcing the Act, is empowered to determine whether an individual meets the definition of "supervisor" in the Act. Judicial review of the Board's decision is governed by the provisions of the Administrative Review Law (Ill. Rev. Stat. 1987, ch. 110, par. 3—101 *et seq.*). That statute specifies that judicial review of agency action extends to all questions of law and fact presented in the record. It further provides that the agency's findings and conclusions on questions of fact shall be held *prima facie* true and correct. (Ill. Rev. Stat. 1987, ch. 110, par. 3—110.) Where the findings of fact are against the manifest weight of the evidence and it is clearly evident that the Board should have reached the opposite conclusion, the reviewing court may reverse the agency's findings of fact. (*Rockford Township Highway Department v. Illinois State Labor Relations Board* (1987), 153 Ill. App. 3d 863.) Where the question involved is one of law, such as the proper interpretation of a statute, the Board's finding is not binding on the court. *City of Burbank v. Illinois State Labor Relations Board* (1989), 128 Ill. 2d 335, 345; *City of Peru* (1988), 167 Ill. App. 3d 284.

## Nos. 67147 and 67152

In determining whether the lieutenants and sergeants of the Freeport police department were supervisors within the meaning of the Act, the hearing officer and the Board considered the following facts. The City of Freeport police department employs 42 sworn peace offi-

cers: a chief, assistant chief, four lieutenants, five sergeants, eight corporals and 23 patrolmen. The department is organized in a paramilitary structure in which all superior ranks have authority over those of a subordinate rank. The department is divided into three divisions: patrol, detective and traffic.

The chief of police is responsible for the administration of the department. He works from 9 a.m. to 5 p.m., Monday through Friday, and spends his day writing and reviewing reports and attending meetings. He has little daily contact with police officers and never answers calls for police assistance. The chief is responsible for formulating department policies and issues a police department manual which includes general and special orders relating to the operation of the department. All officers are expected to follow these orders and procedures in a uniform and standardized manner.

The assistant chief assists in the administration of the department and also works from 9 a.m. to 5 p.m., Monday through Friday. His primary duties include making reports, keeping records, and setting up training courses for officers. He has little involvement in the day-to-day supervision of police officers.

The patrol division of the department consists of three lieutenants, three sergeants, three corporals, and 21 patrolmen. The division operates 24 hours a day in three eight-hour shifts, with one lieutenant, one sergeant, one corporal and seven patrolmen assigned to each shift. Each shift is assigned four marked squad cars and one unmarked car.

A patrol lieutenant acts as a full-time shift commander. Sergeants work as acting shift commanders in the lieutenants' absence, which occurs approximately 10 times per month. Corporals also act as acting shift commanders four times per month. When not serving as shift commander, sergeants and corporals perform only

patrol functions. When acting as shift commander, the lieutenants and sergeants (hereafter, ranking officers) perform the following duties.

The shift commander meets with the outgoing shift commander before the shift officially begins to discuss police incidents, and then conducts roll call. At roll call, the shift commander reviews the latest reports with the patrol officers and assigns officers to beats, squad cars and partners. Lieutenants divide the city into either three or four beats, and assign officers to particular beats on the basis of seniority. After roll call, the shift commander checks the sign-in sheet for accuracy, and completes a form indicating the number of men and cars on the shift. After completing this activity, which takes approximately 15 minutes, the shift commander performs patrol duties.

Patrol officers' duties include patrolling the streets, responding to calls for assistance, and observing conditions which may be hazardous to the public. They also operate a radar gun, issue parking and traffic tickets, investigate and handle auto accidents and testify in court proceedings. Patrol officers also back each other up on calls, providing assistance to the officer responding to a call. The dispatcher automatically assigns a backup car for certain calls. A patrol officer may also request backup assistance. Patrol officers are responsible for completing written reports on police incidents to which they respond.

Shift commanders are required by the chief to perform patrol functions for five hours per shift, although they generally patrol for 6½ hours of their 8-hour shift. While patrolling, shift commanders have duties similar to those of the patrol officers. Thus, they observe conditions, investigate accidents, issue parking and traffic tickets, assist the public and testify in court proceedings.

The shift commanders' duties do differ, however, from those of the patrol officers. For example, shift commanders always patrol in an unmarked squad car. All other officers patrol in marked squad cars. The shift commander patrols the entire city, while other officers are assigned to patrol specific beats. Unlike patrol officers, shift commanders are not required to write parking and traffic tickets, although they voluntarily do so. Shift commanders are not routinely assigned calls by the dispatcher. Instead, they are assigned calls only in emergencies and when the regular beat car is busy with another call. Shift commanders have authority to refuse to answer a call, but do not exercise this authority. In 1984, shift commanders answered approximately half the number of calls answered by the corporals and patrolmen.

Shift commanders also provide backup assistance during police calls. The shift commander monitors calls over his radio. If a call sounds potentially dangerous to the responding officer, the shift commander will proceed to the vicinity of the call in case the officer needs assistance. When acting as backup, the shift commander has authority to take command of a call, although this rarely occurs.

Shift commanders have additional functions not performed by the patrol officers. For example, shift commanders perform administrative functions such as approving overtime and vacation requests. Shift commanders also review patrol officers' reports for clarity and accuracy. A shift commander occasionally returns a report to an officer for correction. The shift commander has authority to relieve a man of duty if he becomes ill. Officers who wish to trade days with another officer must submit a written request to the shift commander. A lieutenant and sergeant may trade days off without other approval. When confronted with a manpower shortage on a shift, the shift commander may ask

an off-duty officer to volunteer. The shift commander also has authority to order an off-duty officer to work, but normally does not exercise this authority. Although the department has no formal grievance procedure, shift commanders have authority to resolve officers' day-to-day complaints about working conditions. If the matter cannot be resolved by the shift commander, it is referred to the chief. Lieutenants and sergeants are responsible for evaluating the officers under their command. The sergeant rates the officers and the lieutenant reads and endorses the evaluation. The evaluation is placed in the officer's file and copies are sent to the chief and the police and fire commission.

Any officer with rank and seniority can give "friendly talks" and verbal reprimands to a subordinate officer. Friendly talks serve as a warning for minor violations and occur as often as several times a day. Verbal reprimands occur less frequently and must be given in the presence of the shift commander. Several lieutenants have issued verbal reprimands for tardiness. Shift commanders also have authority to recommend written reprimands and disciplinary suspensions. A shift commander is required to suspend an officer who is one-half hour late for his shift for the remainder of the shift.

The detective bureau is comprised of one lieutenant, one sergeant, four corporals and a patrolman. The patrolman and corporals are responsible for investigating misdemeanors and felonies. The sergeant spends the majority of his time administering the crime-prevention program. He also investigates complaints regarding bad checks and is responsible for handling physical evidence resulting from criminal investigations. The lieutenant does not perform investigation duties. Rather, he spends most of his time at headquarters reviewing cases with the State's Attorney's office, acting as a liaison with the State crime lab and typing complaints and warrants.

When an investigator completes a case file, the lieutenant reviews it for thoroughness and advises the investigator if additional investigation is necessary.

The lieutenant is authorized to exercise the same authority over those under his command in the bureau as the shift commander in the patrol division. The lieutenant has exercised his authority to approve vacation and overtime requests, but has never exercised his authority to issue verbal or written reprimands, or to suspend for tardiness or for disciplinary reasons. The sergeant performs the lieutenant's supervisory duties when the lieutenant is absent.

As stated, section 3(r) of the Act creates a multipart test for determining the supervisory status of employees in police employment. Under this test, police employees qualify as supervisors within the meaning of the Act only if they: (1) perform principal work substantially different than their subordinates; (2) have authority in the interest of the employer to perform one or more of 11 enumerated supervisory functions, or to effectively recommend such action; and (3) consistently use independent judgment in performing or recommending the enumerated actions. Ill. Rev. Stat. 1987, ch. 48, par. 1603(r).

The Act specifically states that, in police employment, supervisory employees are not required to meet the fourth part of the Act's supervisory definition. (Ill. Rev. Stat. 1987, ch. 48, par. 1603(r).) Thus, police employees may qualify as supervisors even if they do not devote a preponderance of their employment time exercising their supervisory authority. An employee will be deemed a supervisor and excluded from a bargaining unit only if he meets all applicable parts of the test.

Both parties agree with the Board's conclusion that the lieutenants and sergeants in the patrol and detective divisions satisfy the second prong of the supervisory definition. The Board determined that these ranking offi-

cers, as shift commanders, have authority to perform at least four supervisory functions. First, they have authority to direct their subordinate officers, in that they approve overtime and personal holiday requests, review police incident reports, assign partners, beats and squads, and occasionally take command of a call. Second, they have authority to discipline subordinate officers with written reprimands. Third, the ranking officers may suspend an officer for tardiness and may recommend disciplinary suspension to the chief. Finally, they have authority to adjust minor grievances of patrol officers.

Because the parties agree that the second prong of the supervisory definition is satisfied, the only issues for our review in Nos. 67147 and 67152 are: (1) whether the principal work of the lieutenants and sergeants in the patrol division is substantially different from that of the patrol officers and (2) whether the lieutenants and sergeants in the patrol and detective divisions consistently use independent judgment when exercising their supervisory authority.

### 1. Principal Work

As stated, an employee may be considered a supervisor only if his principal work is substantially different from that of his subordinates. In applying this prong to police employment, the Board has stated:

"For an employee to be a supervisor, the employee's main undertaking must differ from the main undertakings of his subordinates. He may, at times, engage in similar work as his subordinates and still be determined a supervisor. However, his foremost activity must not be similar. This is not necessarily a quantitative test. An employee may engage in the same work as his subordinates the majority of his time, but if the essence of his work differs from that of his subordinates, a supervisory determination may result if other indicia are present." (Secre-

*tary of State*, 1 Pub. Employee Rep. (Ill.) par. 2009, at 55 (ISLRB 1985).)

The Board has stated that the principal-work test is easily satisfied where the work of the alleged supervisor is obviously and visibly different from that of the subordinates, as, for example, where the rank-and-file employees perform patrol functions and the claimed supervisor performs little or no patrol. (*Village of Alsip*, 2 Pub. Employee Rep. (Ill.) par. 2038 (ISLRB 1986); see *City of Peru*, 2 Pub. Employee Rep. (Ill.) par. 2040 (ISLRB 1986); *City of Burbank*, 1 Pub. Employee Rep. (Ill.) par. 2008 (ISLRB 1985).) Where the alleged police supervisor performs functions facially similar to those of the rank and file, however, the Board will look at what the alleged supervisor actually does, to determine whether the "nature and essence" of his work is substantially different. (*City of Burbank*, 1 Pub. Employee Rep. (Ill.) par. 2008 (ISLRB 1985).) In doing so, the Board considers three factors.

First, it considers whether the alleged supervisor patrols in a different manner than the rank and file. The Board attempts to determine whether the alleged supervisor patrols to provide a police officer presence on the streets and to personally provide police services to the community, or whether the nature and essence of his patrol function is substantially different. Second, the Board considers rank and the supervisory hierarchy. Finally, the Board considers the extent to which the alleged supervisor exercises supervisory authority over his subordinates. If the alleged supervisor frequently exercises supervisory authority, the Board concludes that the nature and essence of his work is substantially different from that of his subordinates. *Village of Alsip*, 2 Pub. Employee Rep. (Ill.) par. 2038 (ISLRB 1986).

The Board considers these factors in an attempt to determine whether the alleged supervisor's employment

is more similar to, than dissimilar from, that of the rank and file. Where the "community of interest" lines up with the rank and file, the alleged supervisor will be included in the collective-bargaining unit notwithstanding the exercise of supervisory functions. *Village of Alsip*, 2 Pub. Employee Rep. (Ill.) par. 2038 (ISLRB 1986).

Applying this standard to the facts in this case, the hearing officer concluded that the ranking officers in the patrol division did not perform "substantially different principal work" than their subordinates. The hearing officer found that the ranking officers patrolled in the same manner as their subordinates, and exercised their supervisory authority so routinely or sporadically that their principal work was not substantially different from that of their subordinates. The Board adopted the hearing officer's conclusions. *City of Freeport*, 2 Pub. Employee Rep. (Ill.) par. 2052 (ISLRB 1986).

The appellate court reversed the Board's conclusion and held that the principal work of the ranking officers in the patrol division was substantially different from that of their subordinates. The court held that the Board overemphasized the time that lieutenants and sergeants spent on patrol and the number of occasions in which they actually exercised their supervisory authority. The court determined that the existence of supervisory authority and the ability to exercise it made the nature of the shift commanders' duties substantially different from those of the rank and file, despite their facial similarity. 169 Ill. App. 3d 151.

In this appeal, the Board and AFSCME argue that the Board's test for determining whether the principal work of the alleged supervisors is substantially different from that of subordinates is reasonably related to the language of the Act and was properly applied by the Board in this case. They argue that the appellate court failed to accord proper deference to the Board's deci-

sion. They contend that the Board's findings were not against the manifest weight of the evidence and, therefore, should have been upheld by the appellate court.

The Administrative Review Law specifies that judicial review of agency action extends to all questions of fact and law presented in the record. (Ill. Rev. Stat. 1987, ch. 110, par. 3—110.) The rule that an administrative agency's findings of fact should not be disturbed unless they are against the manifest weight of the evidence does not apply where the question involved is one of law, such as the proper interpretation of a statutory term. (*City of Peru*, 167 Ill. App. 3d 284.) Courts defer to an agency's construction of an ambiguous statute. (*Illinois Consolidated Telephone Co. v. Illinois Commerce Comm'n* (1983), 95 Ill. 2d 142, 152.) An erroneous construction of a statute by an administrative agency, however, is not binding upon a reviewing court (*Northern Trust Co. v. Bernardi* (1987), 115 Ill. 2d 354, 365; *Winakor v. Annunzio* (1951), 409 Ill. 236, 248). Reviewing courts may not rubber-stamp administrative decisions they deem inconsistent with the statutory mandate or that frustrate the policy underlying the statute. *Bureau of Alcohol, Tobacco & Firearms v. Federal Labor Relations Authority* (1983), 464 U.S. 89, 78 L. Ed. 2d 195, 104 S. Ct. 439.

We conclude that the Board's interpretation of the principal-work prong of the supervisory definition with respect to police employment was erroneous. Under the Board's interpretation of the principal-work prong, a police supervisor who performs patrol duties and faces the same dangers as his subordinates is considered to share their "community of interest" and is aligned with the rank and file. Only the amount, or *quantity*, of supervisory authority which the ranking officers exercise can overcome this "community of interest" and create a potential for a conflict of interest. *City of Freeport*, 2 Pub. Employee Rep. (Ill.) par. 2052 (ISLRB 1986); *Village of*

*Alsip*, 2 Pub. Employee Rep. (Ill.) par. 2038 (ISLRB 1986).

The Board improperly gave dispositive weight to the amount of time the ranking officers spend exercising their supervisory authority. The Board essentially requires that the ranking officers be principally involved in exercising supervisory functions before it will find that their work is substantially different from that of their subordinates. (*Village of Alsip*, 2 Pub. Employee Rep. (Ill.) par. 2038, at 262 (ISLRB 1986) (Board member Manning dissenting).) The Act expressly states, however, that the fourth prong of the supervisory test need not be satisfied with respect to police employment. (Ill. Rev. Stat. 1987, ch. 48, par. 1603(r).) Thus, a police employee may be deemed a supervisor under the Act even if he does not devote a preponderance of his work time to exercising supervisory authority.

The legislature may have eliminated the preponderance prong with respect to police employment because it believed that supervisory performance in smaller police departments does not require much time, or because it believed that there is less need for supervision given the paramilitary organization of police departments. (*City of Peru*, 167 Ill. App. 3d 284.) Whatever the reason for exempting police supervisory employees from the preponderance prong of the supervisory definition, we conclude that the Board's rigid counting of the number of times the ranking officers exercised supervisory authority in an attempt to determine whether their principal work was substantially different from that of the patrol officers was improper.

Supervisors are excluded from bargaining units under the Act to avoid the conflict of interest which arises when supervisors, who must apply the employer's policies to subordinates, are subject to control by the same union representing those subordinates. (*Beasley v. Food*

*Fair of North Carolina, Inc.* (1974), 416 U.S. 653, 660, 40 L. Ed. 2d 443, 449-50, 94 S. Ct. 2023, 2027; *Village of Oak Park v. Illinois State Labor Relations Board* (1988), 168 Ill. App. 3d 7.) In determining the status of supervisory employees whose duties closely parallel those of their subordinates, the Board must identify the point at which an employee's supervisory obligation to the employer conflicts with his participation in union activity with the employees he supervises. The Board's analysis in this case fails to identify the point at which such a conflict of interest arises.

The potential for a conflict of interest lies in the supervisor's *authority* to influence or control personnel decisions in areas most likely to affect the employment of subordinates and, thus, most likely to fall within the scope of union representation. (See *Village of Alsip*, 2 Pub. Employee Rep. (Ill.) par. 2038, at 262 (ISLRB 1986) (Board member Manning dissenting); *State of California*, 5 Pub. Employee Rep. (Cal.) par. 12014 (CPERB 1980).) The Board's reliance upon the number of times such authority was exercised was improper. As Board member Manning pointed out in her dissent in *Village of Alsip*, 2 Pub. Employee Rep. (Ill.) par. 2038 (ISLRB 1986):

> "The nature and essence test [is] a qualitative, rather than a quantitative analysis. The *existence* of the supervisory authority, and the *ability* to exercise it to impact a subordinate's employment *at any time*, changes the nature of the relationship between the [ranking officers] and the patrol officers to an extent which renders the nature of their functions very different despite their facial similarity." (Emphasis in original.) 2 Pub. Employee Rep. (Ill.) par. 2038, at 262 (ISLRB 1986).

In this case, the ranking officers in the patrol division exercise supervisory authority in several areas likely to fall within the scope of union representation. For example, ranking officers have authority to discipline patrol

officers through verbal and written reprimands. Ranking officers also have authority to recommend more severe discipline, including disciplinary suspension for up to five days. A record of such disciplinary measures may be placed in a patrol officer's personnel file, which is submitted to the police and fire commission for consideration. Including the ranking officers in a bargaining unit with those they supervise might adversely affect the ranking officers' willingness to discipline patrol officers.

In addition to their authority to discipline, the ranking officers are also solely responsible for managing and directing the operation of the Freeport police department during their shifts. The chief and the assistant chief are not involved in the daily supervision of patrol officers. Rather, the chief has delegated to the ranking officers the only supervisory authority which exists over the patrol officers. The chief relies upon the ranking officers to observe, direct, evaluate and discipline their subordinates and to ensure that the patrol officers are properly performing their jobs. In this capacity, the ranking officers represent the interests of the chief *vis-a-vis* the patrol officers and are not simply the members of the team who give routine instructions. *Goldies, Inc. v. NLRB* (1st Cir. 1980), 628 F.2d 706; *NLRB v. St. Mary's Home, Inc.* (4th Cir. 1982), 690 F.2d 1062.

Their responsibility for directing the officers and for managing the operation of the department clearly aligns the ranking officers more closely with the chief than with the patrol officers. The authority to direct subordinate officers and to adversely impact those officers through discipline or other measures falling within the scope of union representation makes the nature and essence of the ranking officers' principal work substantially different from that of the patrol officers. It is this authority which creates a possibility of conflicting loyal-

ties, and which requires the exclusion of ranking officers from the bargaining unit.

## 2. Independent Judgment

We next consider whether the ranking officers satisfy the third prong of the supervisory definition, which specifies that the exercise of supervisory authority must not be routine and clerical in nature, but must involve the consistent use of independent judgment. (Ill. Rev. Stat. 1987, ch. 48, par. 1603(r).) The hearing officer concluded that the ranking officers did not satisfy this prong of the supervisory test. The hearing officer determined that the lieutenants' authority to direct (*e.g.*, approve overtime requests and review incident reports) was so circumscribed by orders from the chief that it did not require independent judgment. Similarly, suspensions were imposed pursuant to the chief's orders, and therefore did not involve the exercise of independent judgment. The hearing officer also concluded that disciplinary measures were imposed so rarely that they did not involve the *consistent* use of independent judgment. The Board adopted the hearing officer's findings. *City of Freeport*, 2 Pub. Employee Rep. (Ill.) par. 2052, at 380 (ISLRB 1986).

We need only consider the hearing officer's analysis of the ranking officers' authority to discipline. The hearing officer determined that the ranking officers did not satisfy the third prong of the supervisory definition with respect to discipline because they did not impose discipline frequently. Again, the hearing officer improperly gave controlling weight to the number of times ranking officers exercised their authority to discipline. In requiring the "consistent use of independent judgment," the legislature clearly was not referring to the number of times the alleged supervisor actually exercised his supervisory authority. Rather, the legislature was referring to the number of times in which independent judgment

might be required in performing a particular supervisory function. *NLRB v. St. Mary's Home, Inc.* (4th Cir. 1982), 690 F.2d 1062.

Certain supervisory functions are routine or ministerial in nature and do not generally require the use of independent judgment. The fact that performance of such functions may occasionally require the ranking officer to use discretion or independent judgment is not sufficient to satisfy the third prong of the supervisory definition. For example, the ranking officers do not consistently use independent judgment when exercising their authority to suspend patrol officers for tardiness exceeding 30 minutes, because such suspensions are required by orders of the chief. On the other hand, when the ranking officers exercise their authority to issue written reprimands and to recommend disciplinary suspension, they ordinarily must choose between two or more significant courses of action. Accordingly, the ranking officers consistently use independent judgment when exercising their authority to discipline patrol officers.

It is the authority to use independent judgment in imposing discipline, rather than how often such discipline is imposed, which is important. (*City of Peru*, 167 Ill. App. 3d 284; *NLRB v. Harmon Industries, Inc.* (8th Cir. 1977), 565 F.2d 1047; *Arizona Public Service Co. v. NLRB* (9th Cir. 1971), 453 F.2d 228.) It would be absurd to require a supervisor to continuously discipline subordinates who do not deserve discipline. The supervisor's authority to discipline is what distinguishes him from his subordinates. The fact that the ranking officers exercise this authority infrequently is proof that the patrol officers do not warrant discipline rather than that their supervisors do not use independent judgment when they impose discipline. The ranking officers clearly satisfy the third prong of the supervisory definition with respect to discipline.

In addition to satisfying all three prongs of the supervisory definition, the ranking officers also have other "indicia of authority" which add weight to the conclusion that they are supervisors within the meaning of the Act. First, a ranking officer acting as shift commander is regarded by himself and the patrol officers as a supervisor. (*NLRB v. Scoler's Inc.* (2d Cir. 1972), 466 F.2d 1289; *Arizona Public Service Co. v. NLRB* (9th Cir. 1971), 453 F.2d 228.) Second, ranking officers receive substantially greater pay than patrol officers with equivalent seniority. (See *West Penn Power Co. v. NLRB* (3d Cir. 1964), 337 F.2d 993.) Most significantly, in the late evening and early morning hours there are no personnel with authority higher than the ranking officer on duty. If the ranking officers are not supervisors, the Freeport police department operates entirely without supervision a large part of the time. In such circumstances, it is not unreasonable to conclude that even the relatively small amount of supervisory power exercised by the ranking officers makes them representatives of their employer. See *Vega v. NLRB* (1st Cir. 1965), 341 F.2d 576; *Jas. H. Matthews & Co. v. NLRB* (8th Cir. 1965), 354 F.2d 432; *Eastern Greyhound Lines v. NLRB* (6th Cir. 1964), 337 F.2d 84.

Because the ranking officers of the Freeport police department satisfy all three prongs of the supervisory definition, we hold that they are supervisors within the meaning of the Act. Accordingly, they must be excluded from the bargaining unit. The appellate court's decision, which reversed the order finding the City of Freeport to be guilty of an unfair labor practice, is affirmed.

## No. 67181

The Wheeling fire department consists of 41 employees: the chief, the captain, a fire inspector, six lieutenants, 30 firefighter/paramedics, one firefighter, and one

secretary. The department is organized in a paramilitary structure with a chain of command from the chief down through the captain and lieutenants to the firefighters. The fire department maintains two fire stations, a main station and a substation, both of which are staffed continuously by lieutenants and firefighters who are assigned to one of three 24-hour shifts.

The chief is responsible for the administration of the department. He typically works from 8 a.m. to 4 p.m., Monday through Friday. He rarely responds to emergency calls. When he does respond, he generally does not take an active command role.

The captain, who is directly below the chief in the chain of command, also works from 8 a.m. to 4 p.m., Monday through Friday. The captain assists the chief in the administration of the department and in the planning and directing of the firefighting and emergency rescue services. The captain also establishes training exercises which the lieutenants use to drill the members of their shift.

The six lieutenants report to the captain and are evaluated by him semiannually. Each lieutenant works as a shift commander at one of the two substations and has five or six firefighters reporting directly to him. The lieutenant is responsible for the condition of the station, equipment, and personnel assigned to his shift. He must enforce department regulations and ensure that firefighters under him are adequately trained and prepared to perform in an emergency. In the lieutenant's absence, assistant shift commanders (firefighters appointed by the chief) assume his duties.

Both stations are manned by three 24-hour shifts which begin and end at 7 a.m. Each shift works 24 hours and is off duty for 48 hours. At the beginning of each 24-hour shift, the lieutenant is briefed by the outgoing lieutenant and then takes attendance. The lieutenant

must report all incidents of tardiness, including his own, to the captain. Only the captain or chief may excuse tardiness. A first-time offender receives a verbal warning from the lieutenant, who sends a written confirmation of the tardiness and the verbal warning to the captain. Subsequent incidents of tardiness within a 12-month period may result in either a written reprimand or a suspension. Both lieutenants and firefighters have been suspended by the chief for tardiness.

The normal staffing level at each station is one lieutenant and five firefighters. The minimum staffing requirement is five persons at the main station and three persons at the substation. Lieutenants are counted for purposes of meeting the minimum staffing requirement. If one of the stations falls below the minimum staffing requirement, the two lieutenants discuss the matter and transfer men between the stations to balance the shift. If fewer than eight persons report to work, the lieutenant may call in off-duty firefighters from a list based on seniority.

During the daytime hours, the firefighters and lieutenant perform various tasks while waiting for emergency calls. The firefighters inspect the emergency equipment and perform housekeeping and maintenance duties in accordance with the department's standard operating procedures. Tasks are assigned by the lieutenant upon a rotation system or some other system agreed to by the firefighters on that shift. The lieutenant generally does not assist the firefighters in their housekeeping and inspection tasks. Instead, the lieutenant performs administrative tasks, such as completing reports and preparing for training exercises written by the captain.

After lunch, the lieutenant and firefighters perform training exercises. The lieutenant and firefighters rotate through various positions until all members of the shift have performed the exercise at each position. The lieu-

tenant times the training exercise and later completes a written report, detailing the exercise performed, who participated and the equipment used, which is submitted to the captain. After 4:30 p.m., the lieutenant and firefighters eat dinner and relax at the station. The lieutenant occasionally spends evening hours completing paperwork in his office.

Emergency responses, which include fighting fires and handling medical emergencies, account for approximately 5% of the fire department's shift time. The lieutenant assigns himself and each firefighter to specific positions on the emergency apparatus. At an emergency call, the lieutenant is usually the engine company officer. A "company" refers to the personnel assigned to a vehicle, generally three persons to the engine and two to the ambulance. A "company officer" is the person in charge of the people on the vehicle. The four paramedic lieutenants assign themselves to the ambulance approximately 20% of their duty days, at which time an assistant shift commander (a firefighter) serves as the engine company officer.

The first engine company officer to arrive at the scene, normally a lieutenant, is in command. The engine company officer determines and directs a plan for extinguishing a fire. The lieutenant and firefighters then work together to extinguish the fire. "Still alarms" (fires that do not involve buildings) account for approximately 70% of the fires. At these fires, the lieutenant and a pipeman apply a stream of water onto the fire, while the engineman operates the pump and connects a water line from the engine to a nearby water source. When a building is on fire (a "structural alarm"), the engine company officer and pipeman enter the burning structure together pulling a hose line. The pipeman applies the water to the fire and the engine company officer helps to handle the hose. The captain responds to all structural fires and as-

sumes command when flames are showing (less than half of all structural fires).

In medical emergencies, an ambulance generally responds without an engine company. The paramedic with most seniority, regardless of rank, is responsible for patient care. When an emergency requires both a fire engine and an ambulance, the engine company officer is responsible for the overall scene, but the senior paramedic has authority over patient care.

Lieutenants have authority to issue oral reprimands, written reprimands with the chief's approval, and emergency suspensions. Lieutenants often resolve minor grievances of firefighters, such as personality conflicts and equipment problems. More serious grievances beyond their authority are referred to the captain. Lieutenants also evaluate firefighters annually. The chief uses these evaluations in preparing promotional recommendations to the board of fire and police commissioners.

Section 3(r) of the Act specifies that in determining the supervisory status of firefighters in new bargaining units, firefighters of the rank of company officer and below are employees under the Act, unless the company officer otherwise meets the Act's four-part supervisory definition. (Ill. Rev. Stat. 1987, ch. 48, par. 1603(r).) The lieutenants in question here are company officers. Thus, unless they meet the definition of supervisor within the Act, they must be found to be employees with the right to engage in collective bargaining activities.

### 1. Principal Work

In analyzing the "principal-work" requirement, the Board concluded that the principal work of the lieutenants was facially similar to that of the firefighters. In reaching this conclusion, the Board noted that the housekeeping tasks performed by firefighters and the administrative tasks performed by lieutenants were "facially

similar" because both served a similar purpose; that is, to keep the personnel active and alert and to maintain optimal preparation for emergencies. The Board thus concluded that because the firefighters and the lieutenants both performed tasks to maintain their readiness to respond to emergencies, their principal work was facially similar.

The Board then stated that it would consider whether the amount of supervisory authority exercised by the lieutenants rendered the nature and essence of their work substantially different from that of the firefighters. Instead, however, the Board simply noted that the lieutenants and firefighters shared a "strong camaraderie which is unique among firefighters." Relying upon this strong community of interest, the Board concluded that the lieutenants at issue were more aligned with the firefighters than with management. The Board therefore held that the lieutenants' principal work was not substantially different from the firefighters and that they were not supervisors within the meaning of the Act.

The Board's strained analysis of the principal-work prong was clearly improper. Even assuming that the principal work of all firefighting personnel is to maintain their readiness to respond to fire emergencies, the lieutenants and the firefighters perform completely different functions in their efforts to maintain such readiness. The administrative tasks which lieutenants perform are certainly not "facially similar" to the household and inspection tasks which the firefighters perform. In addition to performing tasks which are "obviously and visibly different" from those of their subordinates (*Village of Alsip*, 2 Pub. Employee Rep. (Ill.) par. 2038, at 259 (ISLRB 1986)), the lieutenants also have significant supervisory authority which makes the nature and essence of their duties substantially different from those of the firefighters.

The lieutenants are responsible for the condition of the station and equipment and the firefighters assigned to their shifts. They must enforce departmental regulations and ensure that the firefighters are adequately trained and prepared to respond in an emergency. The lieutenants are also responsible for directing and overseeing the manner in which the firefighters perform their duties at the fire station and at the scene of a fire. If a firefighter does not perform his duties properly, a lieutenant may order him to complete the task properly or may discipline the firefighter. In addition, lieutenants evaluate firefighters periodically. Firefighters must receive a satisfactory evaluation from the lieutenants to be eligible for a merit pay increase. The evaluations are also used by the chief in preparing promotional recommendations to the board of fire and police commissioners.

Like the ranking officers in the Freeport police department, the lieutenants here exercise supervisory authority in several of the areas most likely to fall within the scope of union representation. The existence of this authority and the power to adversely affect the employment of the firefighters at any time make the "nature and essence" of the lieutenants' principal work substantially different from that of the firefighters. (*Village of Alsip*, 2 Pub. Employee Rep. (Ill.) par. 2038 (ISLRB 1986) (Board member Manning dissenting).) The fact that a strong camaraderie exists among the firefighters and lieutenants does not change the fact that the daily activities and responsibilities of the lieutenants are very dissimilar from those of the firefighters. We must conclude that the Board's finding that the lieutenants' principal work was not substantially different from that of their subordinates was erroneous.

## 2. Supervisory Authority

The second prong of the supervisory definition specifies that an employee must have authority, in the interest of the employer, to perform one or more of 11 enumerated functions or to effectively recommend such action. The hearing officer found that the lieutenants satisfied this second prong because they had the authority to direct and discipline firefighters. The officer held that lieutenants have authority to direct firefighters at the fire stations, in that they transfer firefighters between stations, approve duty trades, assign tasks and conduct training exercises. She also concluded that the lieutenants have authority to direct firefighters at the scene of a fire. In addition, the hearing officer determined that lieutenants have authority to discipline firefighters with oral reprimands and to recommend written reprimands to the chief. The Board adopted the hearing officer's findings.

The Village argues that the Board improperly concluded that the lieutenants' supervisory authority was limited to the authority to direct and discipline. It contends that the lieutenants also have authority to hire, discharge, promote, reward, suspend, transfer, and adjust the grievances of firefighters, or to effectively recommend such action.

The authority to hire, promote, discharge and reward firefighters is vested by statute in the board of fire and police commissioners. (Ill. Rev. Stat. 1987, ch. 24, par. 10—2.1—1 *et seq.*) Thus, no employee of the Wheeling fire department has any authority to perform such functions. The Village argues, however, that the lieutenants' evaluations of the firefighters are used by the chief in making promotional recommendations to the board of fire and police commissioners, and that the lieutenants therefore have authority to effectively recommend pro-

motions. The evidence in the record shows that the chief relies upon his own observations and the lieutenants' evaluations in rating the candidates up for promotion. The chief's recommendations, however, account for only 10% of a candidate's score in the promotional process. Because the lieutenants' evaluations play only a minimal role in the promotional process, we must conclude that the lieutenants do not have the authority to *effectively* recommend promotions.

The record demonstrates, however, that in addition to their authority to direct and discipline, the lieutenants also have authority to suspend firefighters who report to work intoxicated or otherwise unfit for duty. (See *Eastern Greyhound Lines v. NLRB* (6th Cir. 1964), 337 F.2d 84.) The record also discloses that the lieutenants have authority to adjust minor grievances of firefighters. The hearing officer concluded that because the lieutenants' authority was limited to minor and routine disputes, it did not qualify as authority to adjust "grievances" within the meaning of the Act. The record demonstrates, however, that lieutenants resolve firefighters' complaints about inequitable work assignments, personality disputes and equipment problems. These complaints certainly concern the conditions of employment, and therefore qualify as "grievances" within the meaning of the Act. (See Roberts' Dictionary of Industrial Relations 170-71 (1971) (which defines "grievance" as any complaint by an employee concerning any aspect of the employment relationship).) Accordingly, we conclude that the lieutenants satisfy the second prong of the supervisory test because they have authority to discipline, direct, suspend and adjust the grievances of firefighters.

### 3. Independent Judgment

The third prong of the supervisory definition specifies

that the exercise of supervisory authority must not be routine or clerical in nature, but must involve the consistent use of independent judgment. (Ill. Rev. Stat. 1987, ch. 48, par. 1603(r).) The hearing officer concluded that the lieutenants satisfied this prong only with respect to their authority to discipline.

The Village argues that the hearing officer erred in concluding that the lieutenants do not use independent judgment when exercising their authority to direct the firefighters at the fire station and in emergency situations. The evidence in the record, however, supports the Board's conclusion that the lieutenants do not use independent judgment when directing the firefighters at the fire station. Tasks are assigned according to a system agreed upon by the firefighters and must be performed in accordance with standards set forth in the chief's manual. The lieutenants' authority to transfer firefighters between stations is also routine, in that such transfers are made to meet minimum staffing standards established by the chief. Similarly, the lieutenants' authority to call in off-duty firefighters from a list based on seniority to meet the chief's minimum staffing requirements is routine in nature.

The hearing officer's conclusion that the lieutenants do not use independent judgment in the interest of the employer when directing firefighters at the scene of a fire, however, is less convincing. She concluded that the firefighters were trained to respond automatically and with little direction in emergency situations, and that the lieutenants therefore were not required to use independent judgment when directing the firefighters at fires. Although the fire department's operational procedures are standardized so far as possible, written protocol cannot possibly fit every conceivable situation which arises. The hearing officer's conclusion rests upon the unrealistic view that all fires are routine, present no unantici-

pated or unique characteristics and are controlled by the mechanistic application of set procedures. This view conflicts with common knowledge of such disasters. We agree, however, with the hearing officer's conclusion that any direction which the lieutenants give to firefighters at the fire scene is derived from their superior skill, experience and technical expertise and therefore does not require the use of independent judgment "in the interest of the employer" as required by the statute.

The lieutenants' authority to adjust the grievances of firefighters extends only to minor matters of a routine nature. Therefore, the exercise of this authority does not require the consistent use of independent judgment. When exercising their authority to discipline and suspend firefighters, however, the lieutenants must choose between two or more significant courses of action without broad review or approval by the chief. Therefore, we conclude that the exercise of such authority requires the consistent use of independent judgment. Accordingly, the lieutenants satisfy both the second and third prongs of the supervisory definition only with respect to their authority to discipline and suspend firefighters.

### 4. Preponderance of Employment Time Performing Supervisory Functions

The fourth prong of the supervisory definition specifies that the alleged supervisor must spend the preponderance of his employment time exercising supervisory authority. The Board has interpreted the term "preponderance" to mean that the most significant allotment of the employee's time must be spent exercising supervisory functions. (Secretary of State, 1 Pub. Employee Rep. (Ill.) par. 2009, at 55 (ISLRB 1985).) In other words, the employee must spend more time on supervisory functions than on any one nonsupervisory function. (Secretary of State, 1 Pub. Employee Rep. (Ill.) par.

2009, at 55 (ISLRB 1985).) In this case, the evidence demonstrates that the lieutenants rarely exercise their authority to suspend or discipline firefighters. It is therefore clear that the lieutenants do not spend more time exercising this authority than they devote to any other function. The lieutenants therefore do not satisfy the fourth prong of the supervisory definition.

Because the lieutenants of the Wheeling fire department do not satisfy all four prongs of the statutory definition, we must conclude that they are not supervisors within the meaning of the Act. Accordingly, they were appropriately included in the bargaining unit. The appellate court decision affirming the Board's order finding the Village guilty of an unfair labor practice is therefore affirmed.

In sum, in Nos. 67147 and 67152 we hold that the ranking officers of the Freeport police department are supervisors and affirm the decision of the appellate court, which reversed the Board's order finding the City of Freeport to be guilty of an unfair labor practice. In No. 67181, we hold that the lieutenants of the Wheeling fire department are not supervisors and affirm the appellate court decision finding the Village of Wheeling guilty of an unfair labor practice.

*Judgments affirmed.*

JUSTICE MILLER, concurring in part and dissenting in part:

While I agree with the majority's holding that the ranking officers of the City of Freeport police department are supervisors and must be excluded from the bargaining unit, I disagree with the majority's conclusion that the lieutenants of the Wheeling fire department are not supervisors as contemplated by the Illinois Public Labor Relations Act (IPLRA) (Ill. Rev. Stat. 1987, ch. 48, par. 1601 *et seq.*). I therefore respectfully dissent

from the portion of the opinion that affirms the Illinois State Labor Relations Board's order finding the Village of Wheeling guilty of an unfair labor practice.

As the majority recognizes, the exclusion of "supervisors" from the collective-bargaining rights granted to Illinois public employees by the IPLRA was patterned after the National Labor Relations Act (NLRA) (see 29 U.S.C. §151 *et seq.* (1982)). Generally, the drafters of the IPLRA attempted to follow as closely as possible the language found in the NLRA and later judicial decisions interpreting its provisions. (83d Ill. Gen. Assem., Senate Proceedings, May 27, 1983, at 300-01 (statements of Senator Collins).) For instance, the supervisory functions contained in the two acts are virtually identical; the major difference is that the IPLRA, when listing supervisory functions, eliminates "assign" from the list of supervisory functions contained in the NLRA and changes the term "responsibility to direct" contained in the NLRA to "authority *** to *** direct" in its list. (See Ill. Rev. Stat. 1987, ch. 48, par. 1603(r); 29 U.S.C. §152(11) (1982).) Both acts require that the exercise of supervisory authority involve the use of independent judgment rather than be of a routine or clerical nature. It therefore may be helpful to "examine Federal interpretations of the NLRA where those decisions are consistent with the purpose of our act." *City of Burbank v. Illinois State Labor Relations Board* (1989), 128 Ill. 2d 335, 345.

The Federal courts have determined that under the NLRA an employee's direction to others is supervisory, rather than routine or clerical, when the employee responsible for directing other employees is answerable for the discharge of a duty or obligation. (See, *e.g., Maine Yankee Atomic Power Co. v. National Labor Relations Board* (1st Cir. 1980), 624 F.2d 347, 361.) Thus, in *National Labor Relations Board v. Adam & Eve Cosmet-*

*ics, Inc.* (7th Cir. 1977), 567 F.2d 723, 727-29, an employee was held to possess supervisory status after the court found that the employee had been reprimanded for the performance of others in his department.

I believe that the case before us demonstrates the merits of the test of independent judgment employed by the Federal courts when analyzing whether the employee in question possesses the responsibility to direct others. The majority's analysis concludes that the lieutenants do not exercise independent judgment because their assignment of tasks relating to the inspection of emergency equipment and maintenance duties is in accordance with the department's standard operating procedure. Yet by truncating the inquiry at that point, such an analysis overlooks the fundamental importance of the lieutenants' duties. The lieutenants are left with their independent judgment to determine how to motivate the firefighters to ensure the performance of the tasks assigned, both at the fire station and in emergency situations. Lieutenant Hoos, when explaining the difference between the salary he receives and the salary received by a senior firefighter, explained: "I am the leader of the team and I am ultimately responsible for what the team does and how it performs. *** I have the responsibility to see that the rules and regulations and the SOP's are adhered to." Lieutenant Wydra added in his testimony: "I am accountable to the Captain for things that don't get done."

The record before us reveals that each lieutenant in the Wheeling fire department serves as shift commander at one of the department's two stations and has five or six firefighters who report directly to him. The lieutenant is responsible for the condition of the station, equipment and personnel assigned to his shift and is required to enforce the department's rules and regulations and ensure that the firefighters are adequately trained. To aid them in their responsibilities, the lieutenants have

been vested with authority to resolve minor grievances of firefighters, including equipment problems. They may also issue oral reprimands and, if the situation calls for such a drastic measure, issue emergency suspensions. As one Federal court stated when analyzing the reason for not including supervisors in the same bargaining unit as other employees: "The employer cannot discipline, and therefore cannot control, his work force if the people he uses to mete out the discipline on his behalf have a conflict of interest, being union members asked to discipline fellow union members and protected by section 7 [of the NLRA] if they refuse." (*National Labor Relations Board v. Res-Care, Inc.* (7th Cir. 1987), 705 F.2d 1461, 1467.) Such a conflict of interest may affect the supervisor's independent judgment. This same concern motivated the General Assembly to exclude supervisory personnel from the same bargaining unit as nonsupervisory personnel when drafting the IPLRA. See 83d Ill. Gen. Assem., Senate Proceedings, May 27, 1983, at 303 (statements of Senator Collins).

I would therefore adopt the ultimate-responsibility test used by the Federal courts to determine whether under the IPLRA an employee is exercising independent judgment when directing others. Because the lieutenants here are left to their own devices to ensure the adequate performance of the firefighters under them and because they are ultimately responsible for the firefighters' performance, I believe that the lieutenants possess the supervisory authority to direct other employees contemplated by the IPLRA. I therefore would include the lieutenants' authority to direct, as well as their authority to adjust grievances, with the disciplinary and suspension functions recognized by the majority when analyzing whether the lieutenants are excluded from the act's coverage.

However, as the majority explains, crucial to the determination of whether the lieutenants of the Wheeling fire department are supervisors under the IPLRA is the interpretation of a requirement which does not appear in the NLRA: that only those individuals devoting a preponderance of their employment time to exercising the enumerated supervisory functions may be considered supervisory personnel. (See Ill. Rev. Stat. 1987, ch. 48, par. 1603(r).) The majority, without discussion, adopts the Board's interpretation of this provision and mandates that "the employee must spend more time on supervisory functions than on any one nonsupervisory function" in order to qualify as a supervisor under the IPLRA. 135 Ill. 2d at 532.

I find too restrictive the majority's interpretation of the questioned provision. It has long been recognized that a particular statutory construction should be avoided if it presents untoward results. (See *People v. Easley* (1988), 119 Ill. 2d 535, 539-40.) Under the formula adopted by the majority, the only time for which an employee receives supervisory credit is the actual time the employee spends hiring, transferring, suspending, laying off, recalling, promoting, discharging, directing, rewarding, and disciplining employees. It is difficult to imagine a company officer who would qualify as a supervisor under the formula adopted by the majority. Yet the IPLRA requires that "if a company officer otherwise qualifies as a supervisor ***, he or she shall not be included in the fire fighter unit." Ill. Rev. Stat. 1987, ch. 48, par. 1603(r).

Not only does the majority's formula effectively preclude a reasonable possibility of a supervisory exclusion as contemplated by the legislature for a company officer, the formula may require different treatment of two company officers vested with the same authority. For instance, a company officer vested with the same authority

as the lieutenants here but assigned to a particularly unruly team could theoretically spend a preponderance of time directing and disciplining team members. The majority's formula would require the exclusion of the hypothetical company officer from the bargaining unit while allowing the lieutenants at the Wheeling fire department to come within the coverage of the act. I cannot believe that the legislature intended such a result, and therefore would adopt a broader interpretation of the term "exercising such authority" contained within the provision than does the majority.

In my estimation, an employee exercises supervisory authority under section 3(r) of the IPLRA whenever the employee is in a situation which may call upon that employee's authority to hire, transfer, suspend, lay off, recall, promote, discharge, direct, reward, and discipline other employees. An employee then would be excluded from coverage under the act whenever a preponderance of his or her employment time is devoted to a position vested with that authority and the employee is placed in situations that require the exercise of independent judgment on when and how to use it. This interpretation of section 3(r) better facilitates the legislature's intent to exclude a certain class of company officers from the act's coverage.

This interpretation of the questioned provision would also take into account the General Assembly's apparent intent to limit the scope of the supervisory exclusion under the IPLRA as compared to its counterpart in the NLRA. As the majority explains, the IPLRA adds to the definition of supervisor contained in the NLRA the requirements that the principal work of supervisors must be substantially different from their subordinates' and that they must spend a preponderance of their employment time exercising the enumerated supervisory authority. (See *City of Burbank*, 128 Ill. 2d at 345 (where

IPLRA departs from NLRA's statutory scheme, it can be inferred that the legislature intended a different result).) Under the NLRA, an employee is excluded from the act's coverage even if the employee does not spend a preponderance of his or her employment time in a position vested with supervisory authority. Thus, in *National Labor Relations Board v. St. Mary's Home, Inc.* (4th Cir. 1982), 690 F.2d 1062, a licensed practical nurse who served in a supervisory capacity two out of every five shifts was found to be a supervisor under the NLRA. Under my interpretation of the provision requiring that supervisors spend a preponderance of their employment time exercising supervisory authority, such a result would not be possible under the IPLRA.

Further examination of the IPLRA supports a broad interpretation of when a company officer is exercising supervisory authority. The act provides that "if there is no rank between that of chief and the highest company officer, the employer may designate a position on each shift as a Shift Commander and the persons occupying such positions shall be supervisors." (Ill. Rev. Stat. 1987, ch. 48, par. 1603(r).) The Wheeling fire department is administered by the chief and a captain, both of whom work a five-day, eight-hour workweek, with the next level of command being the lieutenants, who serve as shift commanders as well as company officers. Nevertheless, the fact that the lieutenants before us are the highest ranking officials at the station houses for the vast majority of the time may not, standing alone, evidence that they exercise supervisory authority under the IPLRA during a preponderance of their employment time. (But see *American Diversified Foods, Inc. v. National Labor Relations Board* (7th Cir. 1981), 640 F.2d 893, 896 (fact that questioned employee is highest ranking employee present at worksite may lead to finding of supervisory status under NLRA).) However, when this

540

fact is combined with the other indicia of supervisory authority already discussed, I believe that the IPLRA requires that the lieutenants here be excluded from the act's coverage.