DECATUR FEDERATION OF TEACHERS, IFT-AFT, AFL-CIO, Petitioner, v. THE ILLINOIS EDUCATIONAL LABOR RELATIONS BOARD *et al.*, Respondents.

Fourth District   No. 4—89—0772

Opinion filed June 21, 1990.

Wayne B. Giampietro, of Witwer, Burlage, Poltrock & Giampietro, of Chicago, for petitioner.

Neil F. Hartigan, Attorney General, of Springfield (Robert J. Ruiz, Solicitor General, and Ann Plunkett-Sheldon, Assistant Attorney General, of Chicago, of counsel), for respondent Illinois Educational Labor Relations Board.

Sandra J. Holman, of Illinois Education Association-NEA, of Springfield, for respondent Decatur Education Association.

JUSTICE STEIGMANN delivered the opinion of the court:

On appeal, petitioner, Decatur Federation of Teachers, IFT-AFT, AFL-CIO (DFT), appeals an order of the Illinois Educational Labor Relations Board (Board), adopting in full a hearing officer's recommendation and order, which set aside a representation election and ordered a new election to be held. *Decatur School District No. 61*, 5 Pub. Employee Rep. (Ill.) par. 1169, No. 89—RC—0020—S (Illinois Educational Labor Relations Board, Sept. 25, 1989).

We affirm.

### PROCEDURAL BACKGROUND

On February 28, 1989, DFT filed a representation petition with the Board, seeking an election in a bargaining unit consisting of approximately 914 certified employees of the Decatur School District 61 (District). At the time the petition was filed, the District's employees

were represented by the Decatur Education Association, IEA-NEA (DEA).

On March 8, 1989, the parties entered into an agreement for a consent election. The notice of election describing the unit and setting forth the date and times of the election was sent to the parties on March 13, 1989. Subsequently, on April 12, 1989, a preelection conference was held. On the following day, the election was held at three sites—Eisenhower High School, MacArthur High School, and Stephen Decatur High School. The polls were scheduled to be opened for two sessions—a morning session from 7 a.m. to 8:30 a.m. and an afternoon session from 2:30 p.m. to 6 p.m. Three Board agents monitored the voting at the respective polling sites, and DFT and DEA assigned observers to each site for both sessions.

The initial tally of the ballots, conducted immediately after the election, produced the following results:

| | |
|---|---:|
| 1. Approximate number of eligible voters | 949 |
| 2. Void ballots | 2 |
| 3. Votes cast for DEA | 406 |
| 4. Votes cast for DFT | 407 |
| 5. Votes cast for _____ | |
| 6. Votes cast against participating labor organization(s) | 2 |
| 7. Valid votes counted | 815 |
| 8. Challenged ballots | 3 |
| 9. Valid votes counted plus challenged ballots | 818 |

On the day following the count, April 14, 1989, the Board agent to whom the case was assigned served the parties with a "corrected" tally of ballots. Based on the corrected tally, the following figures were produced:

| | |
|---|---:|
| 1. Approximate number of eligible voters | 949 |
| 2. Void ballots | 0 |
| 3. Votes cast for DEA | 405 |
| 4. Votes cast for DFT | 407 |
| 5. Votes cast for _____ | |
| 6. Votes cast against participating labor organization(s) | 2 |
| 7. Valid votes counted | 814 |
| 8. Challenged ballots | 6 |
| 9. Valid votes counted plus challenged ballots | 820 |

At the tally of the ballots, the parties challenged the counting of several ballots. In addition, on April 20, 1989, DEA filed timely objections to the conduct of the election pursuant to section 8 of the Illinois Educational Labor Relations Act (Act) (Ill. Rev. Stat. 1987, ch. 48, par. 1708). On May 3, DFT responded to the objections.

After investigating the circumstances surrounding the objections and the challenges, the Executive Director issued a preliminary order on May 5, 1989 (*Decatur School District 61*, 5 Pub. Employee Rep. (Ill.) par. 1099, No. 89—RC—0020—S (Illinois Educational Labor Relations Board, Executive Director, May 5, 1989)), followed by his recommended decision and order (*Decatur School District 61*, 5 Pub. Employee Rep. (Ill.) par. 1100, No. 89—RC—0020—S (Illinois Educational Labor Relations Board, Executive Director, May 10, 1989)) advising the parties of his determination and disposition of the matters at issue. In those orders, the Executive Director ordered the election conducted on April 13, 1989, to be set aside, and a new election to be conducted on May 24, 1989. More specifically, the Executive Director sustained objection No. 1 filed by DEA, which involved the temporary closing of one election site.

The Executive Director also ruled on six challenges. First, he accepted DFT's withdrawal of its challenge to the ballot of Cole Williams and overruled the challenges to two late voters. Thus, he ruled that all three of these ballots should be counted. With regard to the last three challenged ballots, he ruled one ballot void, another ballot cast for DFT, and the remaining ballot cast for "No Representative."

On May 10, 1989, DEA filed a motion to stay the Executive Director's actions. Two days later, DFT filed a response to DEA's motion to stay. On May 15, 1989, both labor organizations filed exceptions to the Executive Director's recommended decision and order. That same day, DFT filed a response to DEA's "limited exception." On May 23, 1989, the Executive Director found probable cause to hold a hearing.

On May 30, 1989, the Board reversed the Executive Director, cancelled the May 24, 1989, election, and ordered a hearing to be held on all objections and challenges, stating that it was not prepared to find, without benefit of hearing, that such conduct affected the outcome of the election. (*Decatur School District 61*, 5 Pub. Employee Rep. (Ill.) par. 1118, No. 89—RC—0020—S (Illinois Educational Labor Relations Board, May 30, 1989).) It also noted that in the private sector and some public jurisdictions, there must be an affirmative showing that eligible voters were disenfranchised by a deviation from the scheduled voting times, recognizing this standard was an unresolved issue of law under the Act. See *Decatur School District 61*, 5 Pub. Employee Rep. (Ill.) par. 1118, No. 89—RC—0020—S, at IX-264 (Illinois Educational Labor Relations Board, May 30, 1989) (and cases cited therein).

On June 5, 1989, a hearing was held on all challenges and objections to the election. At that hearing, the parties entered into several

stipulations. Two stipulations related to the challenged ballots. The first stipulation was that the ballot of Cole Williams should be counted. The second stipulation was that the ballot opened and stating, "get rid of State Representative," should be counted for DFT. As a result of these stipulations, the votes were retallied to read:

1. Approximate number of eligible voters — 949
2. Void ballots — 0
3. Votes cast for DEA — 406
4. Votes cast for DFT — 408
5. Votes cast for _____
6. Votes cast against participating labor organization(s) — 2
7. Valid votes counted — 816
8. Challenged ballots — 4
9. Valid votes counted plus challenged ballots — 820

A written stipulation, also agreed to by the parties, read as follows:

"The Board Agent assigned to the MacArthur Polling site did temporarily close down the polls between 4:15 p.m. and 4:30 p.m. to take a rest-room break. He posted signs at the entrance of the polling place and immediately inside that area which stated that the polls would be closed for the 15-minute time period.

At approximately 4:15 p.m., the Board Agent sealed the ballot box, signed the seal and secured the signatures of the observers on the seal. He then packed the ballot box and unused ballots, and he and the observers proceeded to leave the polling place. A review of the official voter lists indicated that Jane Spires was not checked off as having voted in the election."

The hearing officer made additional findings of fact based on the record. Spires, a District employee for 13 years, testified she went to the polls during the time period that they were temporarily closed. Upon learning that the polls were closed, Spires stated that she decided not to wait for the polls to reopen because she had several appointments that afternoon. Spires further stated that because of her appointments, she was unable to return to the polls before they closed at 6 p.m. No one from the Board advised Spires that if she was a few minutes late she could vote subject to challenge, nor did anyone from the Board advise Spires that she could try to vote at one of the other polling sites if she so desired. *Decatur School District No. 61*, No. 89—RC—0020—S (Illinois Educational Labor Relations Board, Hearing Officer's recommended decision and order, July 7, 1989 (unpublished decision) (slip at 6-7)) (hereinafter Hearing Officer's decision).

Joe Opitz, an English teacher at MacArthur High School, also testified at the hearing. As the DEA observer, he was present for both voting sessions. He also attended the preelection conference on April 12, 1989. During the preelection conference, Opitz stated that there had been no discussion of the polls being closed for breaks. In fact, it was stated that the polls would not be closed for breaks; they would be closed only in case of an emergency.

When Opitz arrived for the start of the afternoon session at the MacArthur site, the Board agent told him and the DFT observer that he was going to take a break about 4:15 p.m. because he did not think he could last until 6 p.m. Neither of the two observers had any objection at that time to the Board agent closing the polls. In addition, they did not sign any written agreement or stipulation that the polls would be closed for 15 minutes.

After the polling site closed, Opitz left the area and went to the second-floor teachers' lounge for approximately 10 minutes. On his way back to the site, he noticed an unidentified woman at the main entrance of the building. She was leaving and appeared to be very angry. Opitz testified that she stated, "I came to vote and they wouldn't let me vote, the polls were closed." Opitz told her that they were going to be open in about five minutes and she replied, "I don't have time," and left. Opitz did not know the identity of the woman.

When Opitz returned to the polling site, there were approximately five or six people waiting to vote. The Board agent returned at approximately 4:27 or 4:28 p.m. At that point, the ballot box was reopened and then the polls reopened. The voting list for the MacArthur site indicates that 58 people on the voting list did not vote during the election. Hearing Officer's decision, slip at 7-8.

On June 20, DEA filed a post-hearing brief to the hearing officer. The next day, DFT filed its post-hearing memorandum. Subsequent to these filings, the hearing officer issued his recommended decision and order. He concluded that the closing of the polls for 15 minutes could have affected the outcome of the election and sustained DEA objection No. 1. Because the hearing officer determined that the closing of the polls alone was a sufficient basis to set aside the April 13, 1989, election, he did not rule upon the other objections or challenged ballots.

On August 28, 1989, and September 25, 1989, after the parties filed exceptions and briefs, the Board adopted the hearing officer's findings of facts, conclusions of law, and supporting rationale, and ordered a new election be held. (*Decatur School District No. 61*, No. 89—RC—0020—S (Illinois Educational Labor Relations Board, Aug.

28, 1989 (unpublished order)); *Decatur School District No. 61*, 5 Pub. Employee Rep. (Ill.) par. 1169, No. 89—RC—0020—S (Illinois Educational Labor Relations Board, Sept. 25, 1989).) The Board did not address the other objections or the challenged ballot issues, including the challenged ballots of two late voters.

A new election was held on September 28, 1989, and DEA won. On October 6, 1989, the Board certified DEA as the exclusive representative of the District's certified employees.

On appeal, DFT requests review of that portion of the order of the Board entered on May 30, 1989, which cancelled the rerun election scheduled for May 24, 1989, and ordered a hearing on objections and challenges to the election previously held. DFT further petitions the court to review the order by the Board entered on August 28, 1989, which upheld objections to the election held on April 14, 1989, and ordered a rerun election. Last, DFT requests review of the opinion and order entered by the Board on September 25, 1989 (*Decatur School District 61*, 5 Pub. Employee Rep. (Ill.) par. 1169, No. 89—RC—0020—S (Illinois Educational Labor Relations Board, Sept. 25, 1989)).

### THE STANDARD OF REVIEW

■■ In order to overturn a decision of the Board, this court must determine that the Board's findings of fact are against the manifest weight of the evidence and that the Board's conclusions of law are not supported by the Act (Ill. Rev. Stat. 1987, ch. 48, par. 1701 *et seq.*). As in other administrative review cases, the findings and conclusions of the Board on questions of fact are considered *prima facie* true and correct. (Ill. Rev. Stat. 1987, ch. 110, par. 3—110; *City of Freeport v. Illinois State Labor Relations Board* (1990), 135 Ill. 2d 499.) Courts may not interfere with the discretionary authority vested in an administrative agency unless that authority is exercised in an arbitrary or capricious manner or is against the manifest weight of the evidence. *City of Freeport*, 135 Ill. 2d at 507.

■■ We conclude that considerable deference must be given the Board because of the Board's expertise in educational labor matters. (*Decatur Board of Education, District No. 61 v. Illinois Educational Labor Relations Board* (1989), 180 Ill. App. 3d 770, 775, 536 N.E.2d 743, 746.) To do otherwise would, for practical purposes, transform appellate review into trial *de novo*. (*Decatur Board of Education*, 180 Ill. App. 3d at 775, 536 N.E.2d at 746.) Indeed, such a result would appear to substitute our general knowledge for the expertise required of Board members by section 5 of the Act (Ill. Rev. Stat. 1987, ch. 48,

par. 1705). *Decatur Board of Education*, 180 Ill. App. 3d at 775, 536 N.E.2d at 746.

### GENERAL BOARD STANDARDS FOR REVIEWING ELECTION CONDUCT

Section 8 of the Act sets forth the Board's duty to investigate allegations of improper election conduct and its authority to order a new election when improper conduct is found that affected the outcome of the election at issue. Section 8 states in pertinent part:

> "The Board shall certify the results of the election within 5 working days after the final tally of votes unless a charge is filed by a party alleging that improper conduct occurred which affected the outcome of the election. The Board shall promptly investigate the allegations, and if it finds probable cause that improper conduct occurred and could have affected the outcome of the election, it shall set a hearing on the matter on a date falling within 2 weeks of when it received the charge. If it determines, after hearing, that the outcome of the election was affected by improper conduct, it shall order a new election and shall order corrective action which it considers necessary to insure the fairness of the new election. If it determines upon investigation or after hearing that the alleged improper conduct did not take place or that it did not affect the results of the election, it shall immediately certify the election results." Ill. Rev. Stat. 1987, ch. 48, par. 1708.

Interpreting its duty and authority under section 8, the Board, in *Illinois State Scholarship Comm'n*, 2 Pub. Employee Rep. (Ill.) par. 1125, No. 85—RC—0004—C (Illinois Educational Labor Relations Board, Sept. 26, 1986), stated:

> "It is our judgment that employee free choice in representation matters is crucial. Therefore, it is our duty in regulating the election process to provide an election atmosphere not unlike a 'laboratory' in which the true desires of the employees may be determined. [N.10, see *General Shoe Corp.* (1948), 77 N.L.R.B. 127, 21 L.R.R.M. 1337.] However, although we adopt a 'laboratory' conditions standard, it is not at the expense of chilling a free and vigorous exchange of ideas. Accordingly, we will look at all of the facts realistically and practically, and will not insist upon a totally pristine preelection environment." (*Illinois State Scholarship Comm'n*, 2 Pub. Employee Rep. (Ill.) par. 1125, at VII-363.)

The Board further stated that the burden is on the objecting party to show that (1) the objectionable conduct occurred, and (2) such conduct

affected the outcome of the election. *Illinois State Scholarship Comm'n*, 2 Pub. Employee Rep. (Ill.) par. 1125, at VII-363.

Subsequent to its decision in *Illinois State Scholarship Comm'n*, the Board utilized the objective standard set forth therein to set aside elections based on improper conduct by both an employer and an agent of the Board. In *Centralia School District 135*, 4 Pub. Employee Rep. (Ill.) par. 1094, No. 87—RC—0012—S (Illinois Educational Labor Relations Board, Feb. 25, 1988), the Board set aside an election and stated, "we conclude that the Superintendent's conduct reasonably could have affected the outcome of the election, warranting our setting the election aside." In *Leyden Community School District No. 212*, 4 Pub. Employee Rep. (Ill.) par. 1113, No. 88—RC—0018—C (Illinois Educational Labor Relations Board, Aug. 11, 1988), the Board set aside an election and stated that, where a Board agent left a ballot box unattended during polling hours, this type of conduct reasonably could have affected the outcome of the election.

██ █ Section 8 of the Act discusses two different standards applicable to a claim that an election was affected by improper conduct: (1) before investigating an allegation of improper election conduct, the Board must find probable cause that the conduct *could have affected* the outcome of the election; and (2) before ordering a new election, the Board must find that the outcome of the election *was affected* by the improper conduct. (Ill. Rev. Stat. 1987, ch. 48, par. 1708.) We note that the Board, in directing that a new election be held, applied the less stringent standard applicable only to deciding whether an investigation is required—"that the conduct reasonably could have affected the outcome of the election"—rather than the standard articulated in section 8 of the Act applicable to deciding whether to order a new election—"that the outcome of the election was affected by improper conduct." (Ill. Rev. Stat. 1987, ch. 48, par. 1708.) However, because we find that the Board reached the correct result even though it applied the wrong standard, we will not remand this case for further proceedings. Instead, we will apply the more stringent standard to our analysis of the instant case.

## THE PARTIES' ARGUMENTS

On appeal, DFT argues that the Board agent's conduct was not improper. DFT asserts that there was no affirmative showing that anyone was "completely disenfranchised" because any voter appearing at the polls during the period in which they were closed could have waited until they reopened or returned later to vote. According to DFT, the evidence disclosed nothing more than voter inconvenience

which, standing alone, is an insufficient basis for overturning an election.

DFT further asserts that because DEA's observer consented to the Board agent's decision to close the polls, DEA's claim is without merit since, in effect, DEA played an "integral part" in the conduct it now objects to.

In response to DFT's argument, DEA contends that the Board agent's conduct in temporarily closing the polls at the MacArthur polling place was improper because the action was taken under circumstances that did not pose an emergency. DEA argues that the Board agent made a premeditated decision at 2:30 p.m. to close the polls for a 15-minute restroom break. In addition, DEA contends that such action was improper because there had been no agreement by the parties to the election (as opposed to the observers) to alter the voting hours.

DEA further argues that the temporary closing of the polls affected the outcome of the election. According to DEA, the closeness of the election results supports a reasonable inference that the Board agent's conduct affected the outcome of the election. DEA argues that when, as here, a voter is improperly disenfranchised, the election must be set aside and a new election conducted.

### ANALYSIS

The Act and the Board's rules and regulations are silent on the issue of deviation from scheduled voting times. In addition, the Board has issued no case to date that directly addresses this issue. The only reference to voting times in Board policy appears in the Board's Representation Case Handling Manual. Section 4.11 of that manual, regarding on-site voting procedures, states that the polls should be opened at the "designated" time, and "the polls should be declared closed exactly at the scheduled time."

■ As noted by the Executive Director and the Board in this case, in the private sector, the criteria for determining whether an election should be set aside based on a Board agent's deviation from scheduled voting times are (1) whether employees were disenfranchised as a result of the deviation; and (2) whether the disenfranchisement affected the outcome of the election. (See *L.C. Cassidy & Son, Inc. v. NLRB* (7th Cir. 1984), 745 F.2d 1059, 117 L.R.R.M. 2518; *NLRB v. Klingler Electric Corp.* (5th Cir. 1981), 656 F.2d 76, 107 L.R.R.M. 3011; *Whatcom Security Agency, Inc.* (1981), 258 N.L.R.B. 985, 108 L.R.R.M. 1185; *NLRB v. Fenway Cambridge Motor Hotel* (1st Cir. 1979), 601 F.2d 33, 101 L.R.R.M. 2858; *NLRB v. L.D. Mc-*

*Farland Co.* (9th Cir. 1978), 572 F.2d 256, 98 L.R.R.M. 2037; *B & B Better Baked Foods, Inc.* (1974), 208 N.L.R.B. 493, 85 L.R.R.M. 1092; *Kerona Plastics Extrusion Co.* (1972), 196 N.L.R.B. 1120, 80 L.R.R.M. 1231; *Repcal Brass Manufacturing Co.* (1954), 109 N.L.R.B. 4, 34 L.R.R.M. 1277.) A similar standard is applied in the public sector. See *Berkeley Township,* 12 Pub. Employee Rep. (N.J.) 17135 (N.J. Pub. Emp. Rel. Comm'n 1985) (where a Board agent's delay in opening polls for 40 minutes disturbed conditions necessary to ascertain the free choice of employees, thereby requiring that the election be set aside); and *Northwest Guidance Clinic,* 1986 MERC 771 (Mich. Empl. Rel. Comm'n 1986) (where a brief delay at a polling site immediately after the polls were opened did not constitute legitimate grounds for overturning an election where the delay was brief, for a legitimate purpose, and did not result in discouraging any voter from voting). See *Decatur School District No. 61,* 5 Pub. Employee Rep. (Ill.) par. 1100, No. 89—RC—0020—S, at IX-242 & n.7 (Illinois Educational Labor Relations Board, Executive Director, May 5, 1989); *Decatur School District No. 61,* 5 Pub. Employee Rep. (Ill.) par. 1118, No. 89—RC—0020—S (Illinois Educational Labor Relations Board, May 30, 1989).

Private and public sector case law from other jurisdictions further provides that there must be an affirmative showing that eligible voters were disenfranchised by the deviation in the scheduled voting times. See *L.D. McFarland Co.,* 572 F.2d 256, 98 L.R.R.M. 2037; *Northwest Guidance Clinic,* 1986 MERC 771.

■ Applying the general standard enunciated in *Illinois State Scholarship Comm'n,* as well as the above-cited private and public sector precedents to the facts underlying this issue on appeal, we conclude that the Board properly determined that the Board agent's conduct in temporarily closing the polls at the MacArthur voting site was improper as such conduct affected the outcome of the election. The Board has the responsibility under the Act to conduct an election that ensures the greatest potential for the exercise of employees' free choice. This responsibility rests with the Board agents that conduct the election. In *Leyden,* the Board agreed with the pronouncements of the National Labor Relations Board (NLRB) that the highest standards possible must be maintained to protect the balloting process and that where the Board cannot certify to the validity of that process, there is no alternative but to set the election aside and to direct another be held.

■ In a situation where, as here, a decision is made to alter the scheduled voting times, and such decision is not precipitated by an

emergency or other exigency, there is a potential for voter disenfranchisement. Such a decision exceeds the authority of a Board agent, particularly when the established voting hours do not indicate a temporary closing of the polls. In addition, there was no advance notice to the parties of the contemplated closing, thus no opportunity for the parties (not the observers) to agree or disagree with the decision. We note, by way of reference only, that the directives in the Representation Case Handling Manual regarding the opening and closing of polls precisely at scheduled times support an inference that an unscheduled closing may not be within a Board agent's discretion, absent unusual circumstances.

That the Board agent's conduct affected the outcome of the election or that his conduct reasonably could have done so is shown by the fact that possibly two voters were disenfranchised by his action. Contrary to DFT's assertion, more than mere voter inconvenience was shown here. In the present case, Spires presented herself at the polling place during the scheduled voting time with the intention of voting. What she found instead was that the polls had been closed. She was denied the opportunity to vote. But for the Board agent's unscheduled closing of the polls, she would have voted. While there was no affirmative showing that other voters were similarly denied the opportunity to vote, the extreme closeness of the election results shows this unauthorized closure affected the outcome of the election. Fifty-eight eligible voters on the MacArthur list did not vote, and only two votes separated the two parties receiving the most votes. Thus, we hold the Board was correct in setting the election aside.

As a final matter, it is necessary to address DFT's argument that DEA waived its right to object to the Board agent's conduct because its observer, Opitz, made a binding decision for DEA when he acquiesced in the unscheduled closing of the polls and signed the certificate on election conduct. While DFT's argument may have some surface appeal, the Board, in adopting the hearing officer's rationale, rejected this argument (Hearing Officer's decision, slip at 23-24), and we agree that it is without merit.

The hearing officer's analysis summarized the law on point. In *Leyden Community High School District 212*, 4 Pub. Employee Rep. (Ill.) par. 1071, the Board agent let the observers for the parties run one election site while the Board agent ran a second election site. Not only did the parties acquiesce in this conduct, but they also signed a stipulation approving it, waiving the right to file objections based on it. Nevertheless, an objection was filed based on the absence of a Board agent from one of the election sites. The executive director set

aside the election and ordered a new one. His decision was affirmed by the Board.

Two NLRB cases, *Nyack Hospital* (1978), 238 N.L.R.B. 257, 99 L.R.R.M. 1362, and *Alterman-Big Apple, Inc.* (1956), 116 N.L.R.B. 1078, 38 L.R.R.M. 1406, lend further support. In both cases, the NLRB stated that its responsibility in establishing election procedures, affording all eligible employees an opportunity to vote, is not subject to waiver by the parties. (*Nyack*, 238 N.L.R.B. at 259, 99 L.R.R.M. at 1363; *Alterman-Big Apple*, 116 N.L.R.B. at 1080, 38 L.R.R.M. at 1406.) Thus, in the instant case, neither Opitz nor DEA had the authority to waive required election procedures.

Based on the foregoing, we affirm the Board's findings of fact and conclusions of law, adopted from the hearing officer's recommended decision and order, as they were not arbitrary or capricious or against the manifest weight of the evidence.

Affirmed.

KNECHT, P.J., and SPITZ, J., concur.