REED-CUSTER COMMUNITY UNIT SCHOOL DISTRICT No. 255-U, Petitioner-Appellant, v. THE POLLUTION CONTROL BOARD *et al.*, Respondents-Appellees.

First District (1st Division)   No. 1—90—2803

Opinion filed July 27, 1992.

Sonnenschein, Nath & Rosenthal, of Chicago (Frederic S. Lane, Patricia W. Hatamyar, and Deborah M. Neyens, of counsel), for petitioner.

Murphy, Timm, Lennon, Spesia & Ayers (Douglas F. Spesia and Neil T. Goltermann, of counsel), and Sidley & Austin (Alan P. Bielawski, of counsel), both of Chicago, for respondents.

PRESIDING JUSTICE BUCKLEY delivered the opinion of the court:

Plaintiff Reed-Custer Community School District No. 255-U seeks administrative review of a final order of the Illinois Pollution Control Board (the Board) which denied its petition to revoke the certification of Commonwealth Edison Company's (CWE's) Braidwood cooling pond as a "pollution control facility" for real property tax purposes as defined under section 21a—2 of the Revenue Act of 1939 (the Act) (Ill. Rev. Stat. 1987, ch. 120, par. 502a—2). Plaintiff contends on appeal: (1) the Board's conclusion that CWE did not obtain the certification by misrepresentation or fraud is against the manifest weight of the evidence; (2) the Board erred in concluding that the "primary purpose" of the pond was pollution control; and (3) the Board erred in failing to find that the pond was excluded from "pollution control facility" status because of certain statutory exceptions under section 21a—2 of the Act. We affirm.

CWE's Braidwood Nuclear Power Station and cooling pond are located in the Reed-Custer school district in Will County. Braidwood Station is designed to generate electricity using steam produced by nuclear power. Simplified, the process works as follows.

Fuel in the reactor core produces heat which is captured in a primary loop of water. The primary loop of water is a pressurized closed-loop system which captures huge amounts of heat without boiling. A secondary closed loop of water captures the heat of the primary loop thereby turning the water in the secondary loop to steam. The steam is then passed through a turbine where the energy from the steam is converted to mechanical energy. The mechanical energy turns the turbine to drive a generator which produces electricity. Water from Braidwood's 2,537-acre cooling pond is used in yet a third loop of water to condense the steam contained in the secondary loop. The now condensed water in the secondary loop is returned to be heated again and again.

As a result of the condensing process, the temperature of the tertiary loop water is increased roughly 20 to 22 degrees. This heated water is returned to the cooling pond to cool and circulate for several days. After cooling, the water is pumped through large pipes back to the condensers, where it is heated again. In total, the water requirements of the third loop are a continuous flow of about 3,250 cubic feet per second (cfs). The Braidwood facility occupies a total of 4,454 acres.

The Kankakee River, at its closest approach, is approximately three miles east of Braidwood Station. The flow of the river is not sufficient to provide the 3,250 cfs of water required to cool the reactor; however, the river does supply 90.8 cfs of water to the cooling pond in 4.5-mile-long pipes. This water is necessary to compensate for evaporation, seepage and the 43.2 cfs of "blowdown" water pumped through pipes to the river. "Blowdown" is cooling pond water whose discharge is necessary to maintain the proper water chemistry in the cooling pond.

■ In April 1985, CWE first filed its application to certify the Braidwood cooling pond as a "pollution control facility" under the Act. A successful certification results in the removal of the pollution control facility from the local tax rolls for real property assessment:

> "§21a—1. Statement of policy. It is hereby declared to be the policy of the State of Illinois that pollution control facilities should be valued, for purposes of the real property tax laws of this State, in relation to 33⅓% of the fair cash value of their economic productivity to their owners." Ill. Rev. Stat. 1987, ch. 120, par. 502a—1.

Section 21a—2 of the Act defines "pollution control facilities" as follows:

> "any system, method, construction, device or appliance appurtenant thereto, designed, constructed, installed or operated for the primary purpose of eliminating, preventing, or reducing air

and water pollution as the term 'air pollution' or 'water pollution' is defined in the 'Environmental Protection Act' ***.

For purposes of assessments made after January 1, 1983, 'pollution control facilities' shall not include, however, (a) any system, method, construction, device or appliance appurtenant thereto, designed, constructed, installed or operated for the primary purpose of (i) eliminating, containing, preventing or reducing radioactive contaminants or energy, or (ii) treating waste water produced by the nuclear generation of electric power, (b) any large diameter pipes or piping system used to remove and disperse heat from water involved in the nuclear generation of electric power ***." Ill. Rev. Stat. 1987, ch. 120, par. 502a—2.

CWE's April 1985 certification request to the agency consisted of a completed certification form, promulgated by the agency, and a cover letter submitted by CWE's tax director. Relevant to the issue of whether CWE's certificate was obtained by fraud or misrepresentation are the following statements within the application and letter.

In section D of the application form, the agency requested a "[n]arrative description of the pollution control facility, indicating that its primary purpose is to eliminate, prevent or reduce pollution." CWE responded:

"The Braidwood Cooling Pond receives water from the station condensers and allows waste heat to dissipate into the atmosphere prior to the recycling or discharging of this cooling water into the Kankakee River. The pond was designed to meet thermal discharge limitation contained in the Illinois Pollution Control Board Rules and Regulations, Chapter 3: Water Pollution, Section 203(i)."

In section E of the application, the agency requested the fair cash value and the net salvage value of the Braidwood pond, the productive gross and net annual income of the pond, and the value percentage which the pond bears to the value of the entire facility. CWE responded that the fair cash value of the pond was $43,222,496; that the pond had no net salvage value; that productive gross annual income was "not applicable"; that the productive net annual income was "none"; and that the requested percentage was "none."

In the signature section of the application, the director of CWE's property tax department certified that the information contained within the application was true and correct and that the "facilities claimed herein, are 'pollution control facilities' as defined within [section 21a—2 of the Act]."

As for the cover letter, the following statements appear:

"Enclosed is the application for certifying (APC Form 151) the Cooling Pond at the Braidwood Generating Station.

The following narrative description of the pollution control facility is submitted:

* * *

2. Please see attached drawings. Note that neither the cooling pond [n]or its associated facilities are related to manufacturing of any kind.

* * *

8. Because this facility deals solely with the thermal pollution in regards to cooling the circulating water from the station, no contaminants are removed or disposed of by this operation.

9. The attachments include Figure 2.1—3—Site Boundary, Restricted Area Boundary and Cooling Pond, Figure 2.4—1—Site Characteristics and Changes to Existing Drainage Features and Figure 3.4—1—General Layout of Braidwood Cooling Pond.

For specific information regarding the technical or operating data of the pond and the equipment, contact *** [at] *** of the Company's Environmental Affairs Department. For general information, contact *** [at] *** of my staff."

On May 9, 1985, the agency denied CWE's application for certification of the Braidwood pond. The stated basis for this rejection was the then recent legislative amendment to section 21a—2, which added the second paragraph to that section, thereby excluding certain facilities from the definition of "pollution control facility." At about the time the agency was considering CWE's Braidwood certification, the agency was also evaluating CWE's request to recertify its cooling pond at the Dresden Nuclear Power Station. The Dresden cooling pond had been certified as a pollution control facility, but upon passage of the amendment to section 21a—2, the Board determined that the amendment required decertification. On administrative review before the circuit court of Cook County, the decertification was vacated and the cause remanded to the Board for further hearings. On remand, the Board reinterpreted the language of the amendments, concluding that the Dresden certification should be reinstated.

Following the Board's recertification of the Dresden cooling pond, CWE requested in November 1985 that the agency reactivate its earlier request for certification of the Braidwood pond. Relevant to this appeal is the following statement contained within CWE's request: "As you know, the litigation involving decertification of cooling lakes and towers has now been completed and all such [pollution control facilities] are still certified."

On April 10, 1986, without conducting a public hearing, the agency certified the Braidwood cooling pond as a "pollution control facility" under the Act. The certified facility is defined as follows:

"Those improvements which constitute the cooling pond: external dikes, internal dikes, emergency spillway, water seepage control, the piping, pump station and screen house providing make-up water to the cooling pond."

On December 31, 1987, plaintiff filed its "petition to revoke certification of pollution control facility" with the Board. Plaintiff invoked section 21a—6 of the Act, which provides:

"§21a—6. Powers and duties of the certifying boards. Before denying any certificate, the Pollution Control Board shall give reasonable notice in writing to the applicant and shall afford to the applicant a reasonable opportunity for a fair hearing. On like notice to the holder and opportunity for hearing, the Board may on its own initiative revoke or modify a pollution control certificate *** whenever any of the following appears:

(A) The certificate was obtained by fraud or misrepresentation;

(B) The holder of the certificate has failed substantially to proceed with the construction, reconstruction, installation, or acquisition of pollution control facilities ***;

(C) The pollution control facility to which the certificate relates has ceased to be used for the primary purpose of pollution control and is being used for a different purpose." Ill. Rev. Stat. 1987, ch. 120, par. 502a—6.

In its petition, plaintiff directed the Board to the previously quoted statements in CWE's certification application and alleged that such statements were fraudulent and misrepresentative in that they misled the Board into believing that the primary purpose of the Braidwood pond was pollution control, rather than providing the Braidwood power plant with a readily available supply of cooled water—a nonpollution control purpose.

CWE moved to dismiss the petition on the ground that the Board had no jurisdiction under the Act to consider third-party revocation petitions. On February 25, 1988, the Board rejected CWE's motion, reasoning that section 21a—6 does not expressly prohibit third-party revocation petitions and, further, that such petitions should be encouraged due to the Board's limited ability to uncover possible fraud and misrepresentation. CWE has not sought review in this court of the Board's order denying its motion to dismiss, and we assume its validity for purposes of this appeal.

The Board held an evidentiary hearing on the petition at which testimonial and documentary evidence was received relative to the truth of the matters asserted in CWE's application, the mechanical workings of the Braidwood station and pond, and the primary purpose of the cooling pond. Much of this evidence has already been detailed above and, for the reasons which follow, we believe it largely unnecessary to detail this evidence further.

On August 30, 1990, the Board, with one member dissenting, issued its opinion and order denying plaintiff's petition for revocation. In its order, the Board recognized that the Act limited its reviewing authority to determining whether CWE knowingly made false statements in its application and not whether, in the first instance, CWE's certificate for the Braidwood pond was correctly issued. Although recognizing its limited role, the Board did in fact discuss the primary purpose of the cooling pond. While the Board did not directly so hold, its opinion arguably reads as if the Board believed that the primary purpose of the cooling pond was pollution control. In any event, after considering each of the alleged statements, the Board found that they were not inaccurate.

On October 2, 1990, plaintiff sought administrative review in this court pursuant to Supreme Court Rule 335 (134 Ill. 2d R. 335) and section 41 of the Environmental Protection Act (Ill. Rev. Stat. 1987, ch. 111½, par. 1041), the latter permitting "any party adversely affected by a final order or determination of the Board [to] obtain judicial review *** within thirty-five days after entry of the order."[1]

■ Turning to the merits of plaintiff's appeal, we agree with the Board that its authority under section 21a—6 of the Act to "revoke or modify a pollution control certificate" was limited to the determination of whether CWE obtained its certificate by fraud or misrepresentation. Contrary to plaintiff's arguments on appeal, the Act simply did not permit the Board to review whether, in the first instance, CWE's cooling pond was properly certified under the Act as a pollution control facility. Once the Board certified the cooling pond in April 1986, modification and revocation could only occur under the limited grounds specified under section 21a—6 of the Act. In this case, plaintiff alleged that revoca-

---

[1]Although not contested by CWE or the Board, we agree with plaintiff that it timely filed its administrative review petition with this court. Section 41 of the Environmental Protection Act expressly provides for a 35-day filing period following the entry of the order complained of. This time period controls over the shorter, 30-day period, provided under our Supreme Court Rule 303(a), which is incorporated by reference in Rule 335(h)(1). See *County of Cook, Cermak Health Services v. Illinois State Local Labor Relations Board* (1991), 144 Ill. 2d 326, 579 N.E.2d 866.

tion was proper because of false statements made to the Board during the application process. Accordingly, the Board's review was limited to determining whether, indeed, CWE made false statements during the application process. Simply put, whether the Braidwood cooling pond is in fact a "pollution control facility" as defined by section 21a–2 of the Act was not before the Board.

Nor do we believe that plaintiff can do indirectly what the legislature prohibited directly. The determination of whether any statement in CWE's application was indeed false did not turn on whether, in fact, the primary purpose of the pond was other than pollution control. CWE's statements were to be measured by assessing whether CWE answered the questions asked and whether the responses given were accurate. By arguing that the primary purpose of the cooling pond was not pollution control, and then measuring statements within the application against that primary purpose, plaintiff is merely bootstrapping its own argument.

On appeal, we are thus presented with reviewing the Board's finding that CWE did not obtain its pollution control certificate by fraud or misrepresentation. The Board's determination relative to whether a given statement was fraudulent is a question of fact, and the Board's determination is *prima facie* true and correct. (Ill. Rev. Stat. 1987, ch. 110, par. 3–110.) Where the findings of fact are against the manifest weight of the evidence and it is clearly evident that the Board should have reached the opposite conclusion, the reviewing court may reverse the agency's finding of fact. (*City of Freeport v. Illinois State Labor Relations Board* (1990), 135 Ill. 2d 499, 507, 554 N.E.2d 155, 159.) As discussed below, the Board's findings of fact regarding the accuracy of CWE's statements are not against the manifest weight of the evidence.

The first statement to which we are directed appears in the application form, and is CWE's response to section D of the form, which requested a "narrative description of the pollution control facility, indicating its primary purpose is to eliminate, prevent or reduce pollution." CWE responded:

"The Braidwood Cooling Pond receives water from the station condensers and allows waste heat to dissipate into the atmosphere prior to the recycling or discharging of this cooling water into the Kankakee River. The pond was designed to meet thermal discharge limitations contained in the Illinois Pollution Control Board Rules and Regulations, Chapter 3: Water Pollution, Section 203(i)."

Plaintiff contends that this statement is fraudulent or misleading as the primary purpose of the cooling pond is not pollution control but to sup-

ply water to cool the condensers. To support its argument that the above statement is fraudulent or misleading, plaintiff cites to the testimony of its expert, who testified that the primary purpose of the cooling pond is to provide a supply of cool water for the production of electricity.

■ As noted earlier, plaintiff cannot bootstrap its argument by reclassifying the primary purpose of the cooling pond. Whether CWE's narrative description was inaccurate turned on whether CWE truthfully answered the question asked. We believe that when the narrative description of the cooling pond is compared to the workings of the facility as a whole, the Board appropriately found that the statement was an accurate narrative description of the pollution control facility. While plaintiff would assert that CWE could have been more specific, we have been directed to nothing within the application questionnaire which required such specificity. In fact, had the Board sought additional information, CWE gave the Board the names and numbers of whom to call if any questions regarding the pond arose. This is hardly fraud and misrepresentation.

The second and third statements to which this court is directed appear in CWE's cover letter to the agency which accompanied CWE's application. In the letter, CWE stated:

"Enclosed is the application for certifying (APC Form 151) the Cooling Pond at the Braidwood Generating Station.

The following narrative description of the pollution control facility is submitted:

* * *

2. Please see attached drawings. Note that neither the cooling pond or its associated facilities are related to manufacturing of any kind.

* * *

8. Because this facility deals solely with the thermal pollution in regards to cooling the circulating water from the station, no contaminants are removed or disposed of by the operation."

Plaintiff contends that paragraphs 2 and 8 are fraudulent and misleading because the cooling pond, contrary to paragraph 2, is *directly* related to manufacturing as it supplies large quantities of water essential to the process of manufacturing electricity. Plaintiff further notes that none of the drawings submitted by CWE demonstrate how the cooling pond functions or how it is connected with the plant. As for paragraph 8, plaintiff contends the cooling pond does not deal "solely with the thermal pollution" but also serves many other purposes.

With respect to these paragraphs, the Board found that paragraphs 2 and 8 were not inaccurate when read in their context. The Board also found that the drawings CWE submitted "accurately depicted the stated method of heat dissipation in the cooling pond." We affirm these findings.

The Board properly noted that paragraph 2 must be read in context. The paragraph immediately preceding this paragraph states as follows:

> "With a two unit operation at the rated power condition, the circulating water flow through the condensers will be approximately 3250 cfs with an approximate rise in water temperature of 22 [degrees] F. Cooling water in this pond is routed by a series of internal dikes that provide an extended flow path to ensure necessary cooling."

Clearly, if CWE were attempting to misrepresent the role of the cooling water as not being related to manufacturing, it would have omitted the above paragraph. This paragraph shows that the cooling water plays a role in the production of electricity. CWE must have intended the term "manufacturing" in paragraph 2 to describe something other than the process conveyed in the above paragraph; otherwise, redundancy would occur. Thus, the manifest weight of the evidence supports the Board's conclusion that paragraph 2, when read in context, is not fraudulent or misleading.

The same can be said for paragraph 8. Clearly, the thrust of this paragraph is to demonstrate that the cooling pond serves to cool, not treat contaminants or sewage emanating from the plant. The use of the word "solely" only serves to highlight this distinction. The Board interpreted paragraph 8 in this context, and we defer to its finding.

Finally, regarding the drawings CWE submitted, plaintiff presupposes inaccurately that the application form requested certain information which CWE omitted. The application only referred to the inclusion of a "process flow diagram describing the pollution control facility." The diagrams CWE presented exhibit an aerial view of the pond, the flow direction of water, the location of dikes and the plant location. Accordingly, the Board's conclusion that the drawings were neither fraudulent nor misleading is supported by the evidence.

■ Plaintiff next directs this court to CWE's November 6, 1985, letter to the agency which requested reactivation of CWE's certification application. CWE had appealed a Board decision to decertify certain other pollution control facilities unrelated to the Braidwood plant. On remand from the circuit court, the Board certified these facilities. The above letter followed, stating in part, "[a]s you know, the litigation in-

volving decertification of cooling lakes and towers has now been completed and all such PCF's are still certified."

Plaintiff contends the letter contains two implicit misrepresentations, and the Board failed to so find. First, CWE failed to emphasize "the obvious and critical distinctions between the Dresden cooling pond and the Braidwood cooling pond." Second, "CWE implied that *all* 'cooling lakes and towers' were to be treated identically without regard to the individual facts of each, and that they were *all* 'PCF's.' " (Emphasis added.) The Board concluded that the letter was not inaccurate in that the "PCF's" to which CWE referred were only those involved in the recently concluded litigation and not the Braidwood facility.

Plaintiff's arguments are unpersuasive. Plaintiff reads into the letter that which is not there. Clearly, CWE was merely referring to the recently ended litigation and its result. The Braidwood facility is not even mentioned or implied. Accordingly, the Board appropriately rejected plaintiff's argument.

Plaintiff next directs this court to part E of CWE's application for certification which addressed the cooling pond's "fair cash value if considered real property," "net salvage value if considered real property," "productive gross annual income of control facility," "productive net annual income of control facility," and "percentage control facility bears to whole facility value." CWE responded to these requests by giving a fair cash value of $43,222,496. CWE stated that the facility had no gross or net income and bore no percentage to the entire facility. In its attached letter, CWE itemized the $43 million figure and noted that the cost of procuring the land underneath the pond had been excluded.

Plaintiff contends that as the facility could not operate without the pond, and because the plant generates huge revenue for CWE, the pond must have some derivative annual income. Plaintiff also asserts that as the pond's underlying land has value, the pond must have a net salvage value at least equal to the value of the underlying land. Accordingly, plaintiff contends that CWE's statements to the contrary are false. The Board rejected all these arguments.

As noted by the Board, plaintiff presented no evidence to counter CWE's figures, nor did plaintiff elicit any testimony from CWE's witnesses on this matter. Absent evidence to counter CWE's figures, the Board's conclusion is not against the manifest weight of the evidence.

Moreover, regarding CWE's income figures, section 21a—3 of the Act provides:

> "For the purposes of this Act, earnings shall be attributed to a pollution control facility only to the extent that the operation thereof results in the production of a commercially saleable by-

product or increases the production or reduces the production costs of the products or services otherwise sold by the owner of such facility. For the purposes of this Section the land underlying a cooling pond shall not be considered a part of a pollution control facility." (Ill. Rev. Stat. 1989, ch. 120, par. 502a—3.)

Plaintiff has not directed this court to any evidence which shows that CWE's Braidwood pond produces the type of earnings defined in the statute. Moreover, the value of the underlying land is not to be considered a part of the pollution control facility. Accordingly, plaintiff has failed to show that the various figures CWE listed were false.

Finally, under the first sentence of section 21a—3, the various figures which CWE allegedly misrepresented are relevant only *after* a pollution control facility has been certified. Thus, the figures had no bearing on the Board's decision-making process relative to whether the cooling pond met the definition of a "pollution control facility." Accordingly, plaintiff can make no showing that CWE's certification was *"obtained* by fraud or misrepresentation" (emphasis added) as a result of these figures.

In summary, plaintiff's entire case is nothing more than an attempt to have the Board and this court decertify the Braidwood cooling pond as a pollution control facility. As noted, the Board's review in this case was limited to determining whether the CWE's certification was obtained by fraud or misrepresentation. This court's role is even more limited as it sits only to review the Board's *factual* findings on the fraud or misrepresentation issue. Under our limited role of review, we determine that the manifest weight of the evidence supports the Board's conclusion that CWE did not obtain its certificate by fraud or misrepresentation.

For the foregoing reasons, the order of the Board denying plaintiff's petition to revoke certification of the Braidwood cooling pond is affirmed.

Affirmed.

CAMPBELL and MANNING, JJ., concur.