# ILLINOIS OFFICIAL REPORTS

## Appellate Court

---

*Department of Central Management Services/The Department of Public Health v. Illinois Labor Relations Board, State Panel*, 2012 IL App (4th) 110013

---

| | |
|---|---|
| Appellate Court Caption | THE DEPARTMENT OF CENTRAL MANAGEMENT SERVICES/ THE DEPARTMENT OF PUBLIC HEALTH, THE DEPARTMENT OF NATURAL RESOURCES, and THE ENVIRONMENTAL PROTECTION AGENCY, Petitioners, v. THE ILLINOIS LABOR RELATIONS BOARD, STATE PANEL; JACALYN J. ZIMMERMAN, MICHAEL COLI, MICHAEL HADE, JESSICA KIMBROUGH, and ALBERT WASHINGTON, the members of said Board and Panel in Their Official Capacity Only; JOHN F. BROSNAN, Executive Director of Said Board, in His Official Capacity Only; WILLIAM WAECHTER, Administrative Law Judge of said Board in His Official Capacity Only; THE LABORERS' INTERNATIONAL UNION OF AMERICA, LOCAL 2002; THE STATE EMPLOYEES ASSOCIATION; and THE AMERICAN FEDERATION OF STATE, COUNTY, AND MUNICIPAL EMPLOYEES, COUNCIL 31, Respondents. |
| District & No. | Fourth District<br>Docket No. 4-11-0013 |
| Argued | November 7, 2012 |
| Filed | November 16, 2012 |
| Rehearing denied | December 24, 2012 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | The Illinois Labor Relations Board erred in declaring that a group of professional engineers with the job title of senior public service administrators were public employees within the meaning of section 3(n) of the Illinois Public Labor Relations Act, and not supervisors within the meaning of section 3(r) of the Act, and were eligible to be included in a collective bargaining unit, since the engineers spent the predominant amount of their time on supervisory activities. |

| | |
|---|---|
| Decision Under Review | Petition for review of order of Illinois Labor Relations Board, State Panel, Nos. S-RC-09-038, S-RC-09-060. |
| Judgment | Reversed. |
| Counsel on Appeal | Joseph M. Gagliardo and Lawrence J. Weiner (argued), Special Assistant Attorneys General, of Chicago, for petitioners. |
| | Jacob Pomeranz (argued), of Cornfield & Feldman, of Chicago, for respondent American Federation of State, County and Municipal Employees. |
| | Lisa Madigan, Attorney General, of Chicago (Michael A. Scodro, Solicitor General, and Sharon A. Purcell (argued), Assistant Attorney General, of counsel), for respondent Illinois Labor Relations Board, State Panel. |
| Panel | JUSTICE POPE delivered the judgment of the court, with opinion. Presiding Justice Turner and Justice Knecht concurred in the judgment and opinion. |

**OPINION**

¶ 1     Petitioners, the Department of Central Management Services (CMS), the Illinois Departments of Public Health (DPH) and Natural Resources (DNR), and the Illinois Environmental Protection Agency (EPA) bring this action for direct review of a decision by the Illinois Labor Relations Board, State Panel (Board), declaring the American Federation of State, County, and Municipal Employees, Council 31 (Council 31), to be the exclusive bargaining representative of a group of professional engineers with the job title senior public service administrator (option 8E), employed at DPH, DNR, and EPA.

¶ 2     The Board, adopting the administrate law judge's (ALJ) findings, concluded the option 8Es were public employees within the meaning of section 3(n) of the Illinois Public Labor Relations Act (Act) (5 ILCS 315/3(n) (West 2008)) and not supervisors within the meaning of section 3(r) of the Act (5 ILCS 315/3(r) (West 2008)) and thus were eligible for inclusion in the collective-bargaining unit.

¶ 3        Petitioners appeal, arguing the option 8Es were supervisory employees within the meaning of section 3(r) of the Act (5 ILCS 315/3(r) (West 2008)). We reverse.

¶ 4                                    I. BACKGROUND
¶ 5        Because the parties are familiar with the facts, we discuss them only to the extent necessary to put the parties' arguments in context.

¶ 6                                  A. Procedural History
¶ 7        On September 9, 2008, Council 31 filed a petition with the Board (case No. S-RC-09-038) to become the exclusive bargaining representative of option 8Es working at DPH, DNR, and EPA. See 5 ILCS 315/9(a)(1) (West 2008). The petition sought to add approximately 25 employees to the bargaining unit.
¶ 8        On October 15, 2008, Laborers International Union of America, Local 2002 (Local 2002), also filed a petition with the Board (case No. S-RC-09-060) to become the exclusive bargaining representative of the option 8Es in DPH, DNR, and EPA. The Board entered an order consolidating the two petitions and scheduled a hearing for October 21 and 22, 2008.
¶ 9        During the October 21 and 22, 2008, hearing, Jason DeWitt, Bruce Yurdin, and William Schuck, option 8E employees with DPH, DNR, and EPA, respectively, testified regarding the job duties of option 8Es. We note the parties stipulated the testimony of these three employees would be representative of what the other petitioned-for employees, if called, would testify to.

¶ 10                                    B. Option 8Es
¶ 11       According to the CMS class specification, a senior public service administrator who is an engineer, *i.e.*, an option 8E, "plans, organizes, coordinates, and reviews the work of a large engineering and technical field staff engaged in conducting field investigations and inspections and monitoring activities."

¶ 12                                 C. DeWitt's Testimony
¶ 13       DeWitt is the section chief of the general engineering section of DPH. The section administers various environmental health programs, including asbestos abatement, swimming facilities, manufactured housing and recreational facilities. DeWitt holds an engineering license and has been an option 8E with DPH for four years. He has 15 subordinates comprised of multiple engineers (engineers III and IV), several clerical persons (including administrative assistants I and II), and another option 8E, John Riley, who reports directly to DeWitt. DeWitt reports to the acting division chief, who in turn reports to the deputy director.
¶ 14       According to DeWitt's testimony, Riley and the engineers respond to complaints from the general public, conduct investigations to determine compliance and enforcement, and generate reports, which DeWitt reviews. DeWitt reviews his engineers' reports for accuracy

and clarity regarding how the facts are presented. DeWitt also reviews his subordinates' work to make sure it conforms to statutes, administrative regulations, and DPH's policies and procedures. He also reviews their findings to determine whether the agency could bring a legal cause of action against the alleged violators. DeWitt testified he spends, on average, two to three hours per week reviewing reports.

¶ 15 DeWitt also testified his staff would seek his involvement in reviewing plans and specifications for asbestos abatement jobs "either because of some matter that the code didn't particularly handle well or had broader implications and so they would typically pull me in to that review *** to find out what direction we would want to go as a department." He testified he would spend approximately four to five hours a week on such work.

¶ 16 DeWitt testified he has trained two employees during the four years he has worked for DPH. DeWitt testified he trains new employees by

"showing them how to assemble an investigative file, [and] also going through the proper way to investigate those cases, whether it be questioning witnesses, collecting evidence, things of that nature to make sure that our policies and procedures are being transferred to them [so] that we're being consistent [so] that no matter which engineer goes to do an investigation they're done the same [way]."

¶ 17 In training clericals, DeWitt makes sure they understand the written manual of procedures for how to perform their job. The clericals frequently come to DeWitt with questions not covered by the manual. DeWitt testified if he aggregated those occurrences it would amount to approximately an hour a day. When asked how much time he spends working with his staff on technical issues, DeWitt replied, "if I aggregated all of those occurrences[,] I would guess around an hour and a half a day."

¶ 18 DeWitt testified, "on a typical normal daily basis *** I authorize time sheets so I do spend some amount of time signing off on time sheets[,] and also for the section there is a weekly time reconciliation that I'm responsible for. No, I mean, that's the majority of my time I spend doing that." DeWitt also testified he has authority to grant or deny his subordinates' time-off requests. He spends 15 minutes a day authorizing such requests.

¶ 19 DeWitt also testified it is part of his job to decide overtime requests. DeWitt considers an employee's personal circumstances in granting overtime and whether denying it would cause the employee a personal hardship. DeWitt used the example of an employee having to drive back and forth from Springfield to Schaumburg to finish a job. DeWitt also testified he does not need his supervisor's approval to grant overtime. According to DeWitt, an overtime issue comes up approximately 10 times per month. He spends a few minutes dealing with each request.

¶ 20 DeWitt testified he has had to deal with disciplinary issues regarding his staff. He would be considered a "first[-]line implementer of discipline with [his] subordinate staff." DeWitt testified about an incident involving an employee and her misuse of state resources. He testified "I believe that we merely extended a reprimand to her in this case." Regarding another incident involving an employee who was abusing sick time, DeWitt testified, "[W]e issued proof status as allowed by the [union] contract so that we could monitor whether or not she was indeed sick the times that she called in." In another instance, DeWitt issued a

memorandum to an employee to relay his concerns to her and notify her what she needed to do to correct the behavior. That memorandum was placed in the employee's personnel file.

¶ 21 DeWitt also conducts evaluations of his staff. DeWitt testified he had evaluated only one merit compensation employee, who has since retired and whose position has remained unfilled. However, DeWitt testified an "accomplished" rating would result in a $150 per-month raise. An "exceptional" rating would result in a $200 per-month increase. DeWitt also testified regarding a one-time annual discretionary bonus, which could also result in a raise.

¶ 22 DeWitt testified he spends the rest of his time

"[t]ypically working on either issues that have come to the department that have been passed to me to be dealt with. It may be dealing with special interest groups, it may be dealing with legislation, rule revisions. I spend a fair amount of time in meetings with different groups, for instance the Illinois Association of Park Districts discussing swimming facility matters.

I spend a fair amount of time engaging the public with those types of meetings. A good amount of time is spent responding to correspondence for those subpoenas. I occasionally get called to testify at hearings. *** I'm [also] engaged quite heavily with the Illinois Attorney General's Office in prosecuting cases that we have sent to them for prosecution."

DeWitt testified he spends two to three days a week testifying in hearings when he is called as a witness.

¶ 23 DeWitt also testified he spends from one to three hours a day on average dealing with calls from the public regarding situations that come within the purview of his section's responsibilities.

¶ 24 DeWitt testified he spends eight hours a week dealing with Freedom of Information Act (FOIA) requests. DeWitt is the "last reviewer" of FOIAs before they go to DPH's FOIA officer. According to DeWitt, he reviews the requested documents assembled by the clerical staff to make sure they do not release protected information.


¶ 25 D. Schuck's Testimony

¶ 26 Schuck testified he has been an option 8E with DNR for 15 years. Schuck testified he is the division manager of project implementation at DNR's Office of Water Resources, which regulates construction within floodways in Illinois and prepares plans and specifications for flood control and water-based recreation projects throughout Illinois. Schuck reports to Gary Clark, the director of DNR's Office of Water Resources.

¶ 27 Schuck testified he has eight subordinates comprised of two senior public service administrators (SPSA), one public service administrator (PSA), two secretaries (all of whom work in the Springfield office) and three civil engineers. While the civil engineers live in the Chicago area, their work could take them anywhere in the state. Ted Montrey, one of the SPSAs, is the head of the design section and prepares plans for construction projects. Schuck testified he gives design plans a "quick look" to see if anything "jumps out" at him. Amy Giesing, another SPSA, works as the operations engineer. She performs inspections of dams

and agency construction projects. The PSA, Jay Johnson, works to acquire land rights. The civil engineers ensure the construction projects are built to specification.

¶ 28    Montrey reports to Schuck regarding funding, design status, and issues that arise during construction. Schuck testified Montrey keeps him informed about "which projects they're working on so that we know how to request funding for those projects, what [the] timetable might be when they'll be ready for construction." Schuck spends approximately an hour to an hour and a half a day on such conversations with Montrey. Schuck noted Giesing had only been at DNR for a couple of years so she has "lots of questions." Schuck testified he advises Giesing regarding how things are done and "what might need to be done as far as inspections as far as her field crew, what they're going to be doing this week, next week and what needs to be done [as well as] what might need additional funding." Schuck testified he speaks with Giesing on average 60 to 90 minutes per day regarding her projects. Schuck testified he communicates with Johnson about 30 to 60 minutes a day regarding the history of the projects. By "history," Schuck testified he meant how a project got to a certain point.

¶ 29    Schuck spends approximately three to four hours per week talking to the three civil engineers. According to Schuck, the engineers "basically tell[ ] me where they are in their construction, [about] any problems that they've encountered [and] if they have any questions."

¶ 30    Schuck also testified he checks the monthly pay estimates for each construction project, which are created by the engineers. Schuck gets one or two per month to check. Schuck testified the engineers follow a format, and he basically uses a calculator and checks the bottom line just to make sure everything "balances." On average, Schuck would spend 5 to 10 minutes per day reviewing his subordinates' time-off requests (some days there are no requests). Schuck checks to make sure the employee has the time available. Schuck also approves overtime, which is frequently required by the nature of the project. According to Schuck, the resident engineers "just basically tell me when [overtime is] coming up and I just have to check and make sure that we have enough money to pay for that because they do get paid for it." Schuck testified he has never disapproved overtime. Schuck testified he spends approximately 10 to 15 minutes twice a month dealing with overtime requests.

¶ 31    Schuck also prepares performance evaluations. While a recommendation of "exceptional" or "unsatisfactory" performance requires the approval of Schuck's supervisor, an "acceptable or "accomplished" rating does not require approval. According to Schuck's testimony, Giesing received an "acceptable" rating that year. While Schuck could not recall exactly, he testified it was routine for an employee to receive a raise of $100 or $150 for an "acceptable" or "accomplished" rating. Schuck did not testify regarding how much of his time is spent conducting employee evaluations.

¶ 32    Schuck testified the two executive secretaries prepare correspondence. Schuck reviews the correspondence to make sure it says what he wants it to say. He spends approximately an hour during a normal week reviewing their work.

¶ 33    Schuck testified he spends the majority of his day "solving problems that come up during the construction" such as "conditions in the field" and "problems the contractor might run into." Schuck testified he uses his engineering background as well as his knowledge of the

rules and the office's mandate to determine how to solve those problems.

¶ 34                                    E. Yurdin's Testimony

¶ 35        Yurdin testified he works as the acting manager of field operations in the Bureau of Water in the water pollution control division of the EPA. The section he manages is in charge of the field operations for Illinois. Yurdin reports to Marsha Wilheight, the chief of the Bureau of Water, who in turn reports to Doug Scott, the EPA director.

¶ 36        Yurdin has six subordinates, all of whom are SPSAs. Yurdin testified his subordinates are located across the state. Their job is to inspect waste water treatment plants, enforce compliance with applicable statutes, and respond to citizen complaints. Yurdin testified the employees often submit work product to him, which he reviews for "[c]onsistency, completeness, thoroughness, accuracy." Yurdin testified he spends between 75% and 80% of his time communicating with his subordinates and reviewing their work product. Yurdin discusses ongoing investigations and fields questions from his subordinates. Yurdin also checks their reports for consistency with other agency decisions in similar cases.

¶ 37        Yurdin also testified he relies on his engineering training and experience in working with his subordinates. According to Yurdin, "the type of work that we do involves wastewater practices, but a lot of it has to do with biological, chemical, and even physical hydrologic and hydrology types of work that are conducted in school. So[,] I'd say that those things *** are the types of things that I rely upon." In addition, Yurdin testified his work involves applying the appropriate quality standards as found in federal guidelines, federal law, federal EPA standards, state law, and state administrative regulations to a particular case. When asked if he was ultimately responsible for decisions about what is consistent and what is compliant with the law, Yurdin replied that while he certainly voices his opinion, he was not sure he had the final word.

¶ 38        Yurdin testified he also writes evaluations for his subordinates and determines whether they have performed "acceptable or accomplished work." An "accomplished" or "exceptional" evaluation can result in a $150 or $200 per-month bonus for the subordinate. Yurdin spends approximately two days per person per year making those evaluations. While authorized to do so, Yurdin testified he rarely needs to approve overtime and did not think he had ever denied an overtime request.

¶ 39                                   F. ALJ and Board Decisions

¶ 40        On December 15, 2008, the ALJ issued his recommended decision and order. The ALJ concluded the option 8Es were public employees within the meaning of section 3(n) of the Act (5 ILCS 315/3(n) (West 2008)) and not supervisors within the meaning of section 3(r) of the Act (5 ILCS 315/3(r) (West 2008)). The ALJ recommended a secret-ballot election be conducted among employees "in the classification title of Senior Public Service Administrator Option 8E to be represented in a bargaining unit of professional employees," where the employees would be given the opportunity to vote whether they wished to be represented (1) by Council 31, (2) by Local 2002, or (3) have no representation. The Board mailed the recommended decision and order to the parties by certified mail that day.

¶ 41     On January 5, 2009, the Board received CMS's exceptions to the ALJ's recommended decision and order. The State excepted the ALJ's findings of fact (1) Schuck and Yurdin did not have authority to exercise any one indicia of supervisory authority and (2) DeWitt's review and approval of overtime did not meet the preponderance of employment time test.

¶ 42     On February 18, 2009, the Board's acting general counsel issued an order on behalf of the Board dismissing as untimely CMS's exceptions to the ALJ's recommended decision and order. The order stated records maintained by the United States Postal Service showed CMS received the ALJ's recommended decision and order on December 17, 2008. According to the Board's rules and regulations, any exceptions had to be postmarked by December 31, 2008. Because CMS's exceptions were postmarked on January 2, 2009, they were untimely. After considering the matter at a February 10, 2009, meeting, the Board declined to review the ALJ's recommended decision and order on its own motion. Because no party filed timely exceptions to the ALJ's recommended decision and order, the parties waived their exceptions and the ALJ's recommended decision and order was final and binding.

¶ 43     On June 11, 2010, this court reversed the Board's determination the State's exceptions were not timely filed and remanded the matter to the Board to consider the merits of the exceptions. *Department of Central Management Services v. Illinois Labor Relations Board, State Panel*, No. 4-09-0491, slip order at 20 (June 11, 2010) (unpublished order under Supreme Court Rule 23).

¶ 44     On December 1, 2010, the Board issued its second decision and order adopting the ALJ's findings that neither Schuck nor Yurdin exercised any indicia of supervisory status. As for DeWitt, the Board accepted the ALJ's finding while he used independent judgment in approving his subordinates' overtime, the amount of time he spent approving overtime was insufficient to be a supervisor under the Act. The Board disagreed with the ALJ's decision DeWitt did not use supervisory authority to discipline subordinates. However, the Board found DeWitt spent a small amount of time disciplining subordinates. Ultimately, the Board agreed with the ALJ's recommendation the option 8Es were not supervisors within the meaning of section 3(r) of the Act (5 ILCS 315/3(r) (West 2008)). Council 31's certification as the representative bargaining unit for the option 8Es was reinstated.

¶ 45     This appeal followed.


¶ 46                               II. ANALYSIS

¶ 47     On appeal, petitioners argue the Board erred in finding the option 8Es were not supervisory employees within the meaning of section 3(r) of the Act (5 ILCS 315/3(r) (West 2008)). Specifically, petitioners contend the option 8Es use independent judgment when they perform the following supervisory functions over other employees: (1) directing, (2) training, (3) reviewing work product, (4) granting or denying overtime and leave requests, (5) evaluating employees, and (6) disciplining their subordinates.


¶ 48                          A. Standard of Review

¶ 49     The Administrative Review Law (735 ILCS 5/3-101 to 3-113 (West 2008)) governs the

judicial review of a decision by the Board certifying a labor organization as the exclusive bargaining representative of a group of employees. 5 ILCS 315/9(i) (West 2008); *County of Cook v. Illinois Labor Relations Board–Local Panel*, 351 Ill. App. 3d 379, 385, 813 N.E.2d 1107, 1113 (2004). According to section 3-110 of the Administrative Review Law, our "hearing and determination shall extend to all questions of law and fact presented by the entire record." 735 ILCS 5/3-110 (West 2008).

¶ 50 This court may apply three standards of review when reviewing the Board's decision, depending on the nature of the question we are considering. If the question is one purely of fact, we deem the Board's findings and conclusions to be "prima facie true and correct" (735 ILCS 5/3-110 (West 2008)), and we will overturn such findings only if they are against the manifest weight of the evidence. *Cinkus v. Village of Stickney Municipal Officers Electoral Board*, 228 Ill. 2d 200, 210, 886 N.E.2d 1011, 1018 (2008). A factual determination is against the manifest weight of the evidence if the opposite conclusion is clearly evident or if the finding is unreasonable, arbitrary, or not based on evidence. *Cinkus*, 228 Ill. 2d at 210, 886 N.E.2d at 1018.

¶ 51 If, however, the question is one purely of law, we give the Board no deference unless it resolved a genuine ambiguity in a statute or regulation it was charged with administering. See *Illinois Bell Telephone Co. v. Illinois Commerce Comm'n*, 362 Ill. App. 3d 652, 656, 840 N.E.2d 704, 708 (2005). We decide legal questions *de novo*. *City of St. Charles v. Illinois Labor Relations Board*, 395 Ill. App. 3d 507, 509, 916 N.E.2d 881, 883 (2009).

¶ 52 We review mixed questions of fact and law by asking whether the agency's decision is clearly erroneous. *AFM Messenger Service, Inc. v. Department of Employment Security*, 198 Ill. 2d 380, 392, 763 N.E.2d 272, 280 (2001). Under the clearly erroneous standard of review we give some deference to the Board's decision, but not as much deference if the question were one purely of fact. *AFM*, 198 Ill. 2d at 392, 763 N.E.2d at 280. A finding is clearly erroneous if, despite the existence of some evidence to support the finding, the evidence in its entirety leaves the reviewing court with the definite and firm conviction that the finding is a mistake. *AFM*, 198 Ill. 2d at 393, 763 N.E.2d at 280-81.

¶ 53 Here, petitioners do not challenge the ALJ's or the Board's findings of facts or the applicable statutory law. Instead, petitioners contend the Board and ALJ erred in their application of the facts to the law. As petitioners' argument raises a mixed question of fact and law, we apply a clearly erroneous standard of review.

¶ 54                              B. Supervisory Status

¶ 55 Section 6 of the Act provides "[e]mployees of the State *** have, and are protected in the exercise of, the right to self-organization, and may form, join or assist any labor organization, to bargain collectively through representatives of their own choosing on questions of wages, hours and other conditions of employment." 5 ILCS 315/6(a) (West 2008). The Act defines "employees" as "individual[s] employed by a public employer, *** excluding *** supervisors." 5 ILCS 315/3(n) (West 2008).

¶ 56 "In order to ensure that a pro-union bias will not impair a supervisor's ability to apply the employer's policies to subordinates in accordance with the employer's best interests, the Act

provides that a bargaining unit may not contain both supervisors and nonsupervisors." *Department of Central Management Services v. Illinois State Labor Relations Board*, 278 Ill. App. 3d 79, 83, 662 N.E.2d 131, 134 (1996). The Act excludes supervisors from bargaining units that contain their subordinates, in order to avoid the conflict of interest that arises when supervisors, who must apply the employer's policies to the subordinates, are subject to control by the same union representing the subordinates. *City of Freeport v. Illinois State Labor Relations Board*, 135 Ill. 2d 499, 517, 554 N.E.2d 155, 164 (1990). We note petitioners state in their brief on appeal the option 8Es "will be in the exact same bargaining unit as their subordinates."

¶ 57 "Supervisors" are those employees who engage in work that is "substantially different from that of [their] subordinates and who ha[ve] authority, in the interest of the employer, to hire, transfer, suspend, lay off, recall, promote, discharge, direct, reward, or discipline employees, to adjust their grievances, or to effectively recommend any of those actions, if the exercise of that authority is not of a merely routine or clerical nature, but requires the consistent use of independent judgment." 5 ILCS 315/3(r) (West 2008). Thus, an individual is a supervisor if all three of the following propositions are true: (1) the individual has principal work substantially different from that of his or her subordinates; (2) the individual has authority on the employer's behalf to perform at least one of the outlined indicia of supervisory authority–namely, the authority to hire, transfer, suspend, lay off, recall, promote, discharge, direct, reward, or discipline employees, to adjust their grievances, or effectively recommend any of those actions–and consistently uses independent judgment in doing so; and (3) the individual spends a preponderance of his time in the job performing supervisory tasks. *City of Freeport*, 135 Ill. 2d at 512, 554 N.E.2d at 162.

¶ 58 In this case the Board upheld the ALJ's determination the option 8Es performed principal work that was substantially different from that of their subordinates. This was undisputed by the parties. Thus, only the second and third elements of supervisory status are at issue in this appeal.

¶ 59                 1. *Indicia of Supervisory Authority*

¶ 60 Petitioners, as the party seeking to exclude the employees from the union, had the burden of proving, by a preponderance of the evidence, the employees were "supervisors." *Department of Central Management Services (State Police) v. Illinois Labor Relations Board, State Panel*, 382 Ill. App. 3d 208, 220-21, 888 N.E.2d 562, 575 (2008). To carry that burden, petitioners had to prove the regional supervisors had the authority to perform 1 or more of the 11 supervisory functions listed in section 3(r), while exercising independent judgment in performing those functions. The exercise of supervisory authority must not be routine and clerical in nature, but must involve the consistent use of independent judgment. *City of Freeport*, 135 Ill. 2d at 520, 554 N.E.2d at 166. An employee uses independent judgment whenever he or she must choose between two or more significant courses of action. *City of Freeport*, 135 Ill. 2d at 521, 554 N.E.2d at 166.

¶ 61 As stated, on appeal petitioners argue option 8Es use independent judgment to direct their subordinates regarding the following supervisory functions: (1) directing, (2) training, (3)

reviewing work product, (4) granting or denying overtime and leave requests, (5) evaluating employees, and (6) disciplining their subordinates. We agree. The following unrebutted evidence shows DeWitt, Schuck, and Yurdin use independent judgment to engage in several indicia of supervisory status.

¶ 62                    a. Supervisory Authority and Independent
                        Judgment To Direct Subordinates

¶ 63      Schuck testified he spends two to three hours each day advising Giesing and Montrey. Schuck testified he advises Giesing, who is relatively new to the job, regarding how things are done and "what might need to be done as far as inspections as far as her field crew, what they're going to be doing this week, next week and what needs to be done [as well as] what might need additional funding." Schuck also testified he discusses project status with Montrey. Those discussions also involve Montrey reporting to Schuck about funding, design status, and issues that arise during construction.

¶ 64      Yurdin testified he spends 75% to 80% of his time in discussions with his subordinates to ensure the enforcement proceedings and investigations are on track and going according to plan. Yurdin also advises his subordinates regarding the interpretation of federal documents and standards and whether certain standards apply in certain situations.

¶ 65                    b. Supervisory Authority and Independent
                        Judgment To Review Work Product

¶ 66      Petitioners argue option 8Es' review of their subordinates' work product shows supervisory authority. We agree.

¶ 67      DeWitt reviews his engineers' reports for accuracy and clarity regarding how the facts are presented. DeWitt makes sure the reports conform to statutes, administrative regulations, and DPH's policies and procedures. He also reviews the report's findings to determine whether the agency could bring a legal cause of action against the alleged violators. DeWitt also testified he reviews his subordinates' plans and specifications for asbestos-abatement jobs. DeWitt's subordinates would also ask him how they should proceed in cases involving code ambiguities or having broad policy implications. DeWitt also testified he reviews the materials his subordinates assemble in response to FOIA requests. DeWitt actively checks the materials to ensure they do not contain confidential medical information prohibited from inclusion by the Health Insurance Portability and Accountability Act of 1996 (HIPAA). He also reviews the documents to make sure they are not related to any ongoing litigation involving the agency. DeWitt also removes certain documents if he determines a subordinate has interpreted a FOIA request too broadly. While DeWitt may be guided by the FOIA requirements and HIPAA privacy rules in reviewing the documents, it is difficult to see how he does not exercise judgment in determining what would be outside the scope of a FOIA request.

¶ 68      Schuck testified he also reviews his subordinates' work. He reviews the work to ensure the plans created by his staff are designed well and comply with construction rules. Schuck

also reviews design plans to see if anything "jumps out" at him. In addition, Schuck testified he reviews the accuracy of his civil engineers' math on the construction project pay estimates to ensure everything "balances" out. Schuck also testified he reviews the correspondence the secretaries prepare to ensure it reflects what he asks to include.

¶ 69    Yurdin testified approximately 10% to 15% of his time is spent reviewing his subordinates' reports. According to Yurdin, his review of the reports involves determining whether they are complete, thorough, and accurate. Yurdin testified he checks the reports for consistency with other DPH decisions in similar cases.

¶ 70                    c. Supervisory Authority and Independent
                         Judgment To Train Subordinates

¶ 71    Petitioners argue option 8Es are supervisors because they train their subordinates. We agree. DeWitt testified he has trained new employees regarding the agency's investigation procedures and how to assemble an investigatory file. He has also trained clerical employees, who come to him with questions regarding how to handle matters not covered by the procedures manual. While DeWitt trains his subordinates pursuant to agency procedures, the record affords no indication he is in any way constrained in the manner in which he chooses to train them or answer their questions regarding matters outside the manual.

¶ 72                d. Supervisory Authority and Independent Judgment
                   To Grant and Deny Leave and Overtime Requests

¶ 73    DeWitt testified he authorizes overtime and leave requests. As the ALJ determined, it appears from the record DeWitt exercises independent judgment in deciding overtime requests. DeWitt testified he considers an employee's personal circumstances in granting overtime and whether denying it would cause the employee any hardship. DeWitt also testified he did not need anyone else's approval prior to granting overtime. Schuck testified he reviews his subordinates' leave requests. Schuck also has discretion to authorize or deny his subordinates' overtime requests. Yurdin testified he has discretion to authorize or deny his subordinates' overtime requests. Whether exercised or not, the inherent authority to choose whether to grant or deny overtime requests without having to obtain further approval demonstrates independent judgment on the part of option 8Es.

¶ 74                    e. Supervisory Authority and Independent
                         Judgment To Evaluate Subordinates

¶ 75    DeWitt testified he evaluates his subordinates. He creates objectives for his subordinates without input from his supervisor and rates them accordingly. DeWitt testified he had evaluated only one merit compensation employee, *i.e.*, non-bargaining-unit employee, who has since retired and whose position has remained unfilled. However, DeWitt also testified an "accomplished" rating would result in a $150 per-month raise. An "exceptional" rating would result in a $200 per-month increase. DeWitt also explained a one-time annual discretionary bonus could result in a raise equal to a percentage of their income.

¶ 76    Schuck testified he evaluates his subordinates. We note the Board found Schuck's "evaluations cannot constitute an indication of supervisor status" because "Schuck is unable to independently impact his subordinates' pay by issuing good or bad evaluations." We disagree. While Schuck's "exceptional" and "unsatisfactory" recommendations require his supervisor's approval, he testified he can unilaterally rate a subordinate either "acceptable or "accomplished." While the Board chose to focus on Schuck's uncertainty regarding whether the resulting raise would be $100 or $150 per month, it appears from his testimony an "accomplished" rating results in a $150 per-month pay increase. This "accomplished" rating is not automatic and requires Schuck to make an independent choice in rating his subordinates' performance.

¶ 77    Yurdin testified he evaluates his subordinates and meets with them to discuss the results. An "accomplished" or "exceptional" evaluation can result in a $150 or $200 per-month bonus for the subordinate. The evidence presented shows DeWitt, Schuck, and Yurdin choose which rating to assign their subordinates. The fact that in some instances their supervisors have to approve the recommendation does not diminish the fact their initial determination is an exercise in judgment between the various ratings choices. For example, while Schuck's "exceptional" recommendation requires approval, he still exercises his judgment independent from any supervisor's input in determining to recommend that rating instead of an "acceptable" or "accomplished" rating. These ratings have the ability to affect subordinates's pay. Option 8Es' ability to affect pay raises through employee evaluations demonstrates their supervisory authority in that regard.

¶ 78                    f. Supervisory Authority and Independent
                        Judgment To Discipline Subordinates

¶ 79    We note petitioners do not argue either Schuck or Yurdin exercised supervisory authority by disciplining their employees. Instead, petitioners focus their argument on DeWitt. As stated, the Board disagreed with the ALJ and found the fact DeWitt could place a memorandum in the employee's personnel file showed supervisory authority. The Board also found DeWitt's authority to place an employee on "proof status" evinced independent judgment sufficient to show an indication of supervisory authority to discipline. We agree with the Board. See 5 ILCS 315/3(r) (West 2008) (supervisors "ha[ve] authority, in the interest of the employer, to *** effectively recommend [discipline], if the exercise of that authority is not of a merely routine or clerical nature, but requires the consistent use of independent judgment").

¶ 80    Here, petitioners presented sufficient and unrebutted evidence to demonstrate option 8Es collectively use independent judgment to (1) train and direct subordinates, (2) evaluate subordinates and their work product, (3) approve time off and overtime for their subordinates, and (4) discipline their subordinates, each of which shows option 8Es exercise supervisory authority under the Act.

¶ 81                    2. *Preponderance of Time Element*

¶ 82    The third element of the supervisory definition specifies the employee must also devote

the preponderance of his employment time to exercising supervisory authority to be found a supervisor. *Chief Judge of the Circuit Court v. American Federation of State, County & Municipal Employees, Council 31*, 153 Ill. 2d 508, 515, 607 N.E.2d 182, 185 (1992). In *City of Freeport*, the supreme court considered the "preponderance" test and accepted the Board's interpretation, stating, "The Board has interpreted the term 'preponderance' to mean that the most significant allotment of the employee's time must be spent exercising supervisory functions. [Citation.] In other words, the employee must spend more time on supervisory functions than on any one nonsupervisory function." *City of Freeport*, 135 Ill. 2d at 532-33, 554 N.E.2d at 171.

¶ 83    We note petitioners request this court find the preponderance of time requirement does not apply in this case because the statute includes the phrase, "State supervisors notwithstanding." 5 ILCS 315/3(r) (West 2008). However, petitioners have forfeited consideration of this issue on appeal by failing to first raise it before the Board. See *Department of Central Management Services*, 278 Ill. App. 3d at 82, 662 N.E.2d at 133 ("The failure of a party to raise an argument in its exceptions to the hearing officer's recommended decision and order waives that argument for purposes of review."). Forfeiture aside, we note this court has previously found the "State supervisors notwithstanding" language of the statute "does not exempt State supervisors from the 'preponderance' requirement." *Department of Central Management Services v. Illinois State Labor Relations Board*, 249 Ill. App. 3d 740, 745, 619 N.E.2d 239, 243 (1993). We decline petitioner's request to reconsider our prior decision.

¶ 84    While the Board found DeWitt exercised supervisory authority to discipline, it determined he did not do so frequently enough to satisfy the preponderance of employment time test. However, the number of times a supervisor exercises his authority is not dispositive. *Village of Maryville v. Illinois Labor Relations Board, State Panel*, 402 Ill. App. 3d 369, 374-75, 932 N.E.2d 558, 563-64 (2010); *City of Freeport*, 135 Ill. 2d at 518, 554 N.E.2d at 164 ("[t]he potential for a conflict of interest lies in the supervisors's *authority* to influence or control personnel decisions in areas most likely to affect the employment of subordinates and, thus, most likely to fall within the scope of union representation" (emphasis in original)). Instead, "it is the existence of the supervisory authority *** that is essential, not the amount of time such authority is exercised." *City of Peru v. Illinois State Labor Relations Board*, 167 Ill. App. 3d 284, 292, 521 N.E.2d 108, 114 (1988); *City of Freeport*, 135 Ill. 2d at 518, 554 N.E.2d at 164-65 ("[t]he Board's reliance upon the number of times such authority was exercised was improper").

¶ 85    Moreover, DeWitt testified he spends two to three hours per week reviewing his subordinates' reports during the slower season and six to eight hours a week in the summer. He also testified he spends approximately eight hours a week reviewing documents compiled by his subordinates in responses to FOIA requests. He also spends an additional hour and a half each day advising and training his subordinates. When asked how much time he would spend directing and advising the clerical staff, DeWitt responded, "if I aggregated all the occurrences, in the neighborhood of maybe an hour a day."

¶ 86    Further, Schuck testified he spends two to three hours a day advising Giesing and Montrey. He also testified he spends three to four hours per week advising the civil

engineers. He also spends one hour each day reviewing the clerical workers' correspondence. Schuck's testimony demonstrates he spends at least four hours per day performing supervisory tasks.

¶ 87    Finally, Yurdin testified 75% to 80% of his time each day is spent in discussions with his subordinates. According to Yurdin's testimony, these conversations bore directly on ensuring his subordinates' investigations and enforcement proceedings were being done on time and in the correct fashion.

¶ 88    In sum, the unrebutted testimony of DeWitt, Schuck, and Yurdin demonstrates they spend a predominate amount of time involved in supervisory functions. Even considering the clearly erroneous standard of review, we conclude the Board erred in finding the option 8Es are not supervisors within the meaning of section 3(r) of the Act.

¶ 89                            III. CONCLUSION
¶ 90    For the foregoing reasons, we reverse the Board's decision.

¶ 91    Reversed.